954 F.2d 130
 1992 A.M.C. 1227
 GRUPO PROTEXA, S.A., a Company organized under the laws of
the Republic of Mexico, and Condux, S.A. de C.V.,
a company organized under the laws of
the Republic of Mexico,
Appellants in 90-6048,
v.
ALL AMERICAN MARINE SLIP, A DIVISION OF MARINE OFFICE OF
AMERICA CORPORATION, a New York Corporation;
AFIA, a Delaware Corporation; and
CIGNA, a Delaware Corporation,
Appellants in 91-5109.
 Nos. 90-6048, 91-5109.
 United States Court of Appeals,
Third Circuit.
 Argued June 13, 1991.
Decided Jan. 8, 1992.
Rehearing Denied Feb. 3, 1992.
 
 Riker, Danzig, Scherer, Hyland & Perretti, Morristown, N.J. (Gerald A. Liloia, of counsel) and (Kenneth M. Van Deventer (argued), Glenn D. Curving, on the brief), for Grupo Protexa, S.A. and Condux, S.A. de C.V.
 Liddell, Sapp, Zivley, Hill & LaBoon, Houston, Tex. (Harold K. Watson (argued), Gregory F. Burch, of counsel), for All American Slip, AFIA and CIGNA.
 Before BECKER and ALITO, Circuit Judges and HUYETT,* District Judge.
 OPINION OF THE COURT
 ALITO, Circuit Judge:
 
 
 1
 Assureds under a marine insurance policy sought to recover the cost of removing a sunken vessel. The marine insurance policy covered removal costs if the removal was "compulsory by law." Two insurance companies denied the claim. After a bench trial, the district court entered judgment for the insurance companies, holding that the removal was not "compulsory by law" and that the assureds had not acted as prudent uninsureds when proceeding with the removal of the wreck. Because we hold that the district court's judgment rests on incorrect conclusions of law, we will reverse and remand for further proceedings.I.
 
 
 2
 In December 1985, the Huichol II, a diving support vessel, sank during a violent storm in the Bay of Campeche, approximately 50 miles off the coast of Mexico. More than 27 Mexican seamen were killed. The wreck of the Huichol II came to rest 1.5 miles within the eastern border of the Petroleos Mexicanos ("PEMEX") oil exploratory zone.[1]
 
 
 3
 The Huichol II was owned by Condux S.A. de C.V. ("Condux"), a wholly owned subsidiary of Grupo Protexa S.A. ("Protexa"). Both companies are organized under the laws of Mexico. Protexa is in the business of constructing and servicing the pipelines, platforms, and related structures needed by PEMEX. Protexa develops and manages maritime construction projects through Condux. For convenience, we will refer to the companies collectively as "Protexa."
 
 
 4
 The Huichol II was insured under a marine insurance policy placed by Protexa's broker, Energy Insurance International ("EII") of Houston, Texas. Keith Mollman ("Mollman") was the manager assigned to Protexa's account. Under the policy, five percent of the risk was placed with a Mexican company. In addition, the policy had two separate layers of coverage. The four primary-layer underwriters were liable for the first $2,500,000 of covered loss. If any single loss exceeded $2,500,000, the excess-layer underwriters would be liable. There were three excess-layer underwriters: All American Marine Slip ("AAMS"), which carried 30% of the excess layer; various Lloyds/London underwriters, which carried 65% of the excess risk; and SIGNA/AFIA, which had 5% of the excess layer. The insurance policy contained a standard wreck removal provision covering expenses the assureds became liable to pay on account of "removal of the wreck of the vessel ... when such removal is compulsory by law." App. at 1671 (emphasis added).
 
 
 5
 The day after the vessel sank, EII was notified of the incident. Acting as liaison between the underwriters and the claimants, EII called in Rush Johnson Associates ("RJA"), a worldwide firm of marine surveyors and adjustors, to survey the damage, adjust the loss, and prepare a written report for the underwriters.[2] RJA appointed Theo Tyssen ("Tyssen"), the vice-president in charge of its marine department, to handle the claim. Tyssen arrived at the scene of the wreck on December 16, 1985. On the same day, EII notified the underwriters on the policy, including AAMS and CIGNA/AFIA, that the Huichol II had sunk and that RJA's representative, Tyssen, had been sent to the wreck location.
 
 
 6
 When Tyssen reached the wreck location, he met with various parties concerning the situation. Because the wreck lay in a PEMEX zone of heavy drilling activity and because he believed that the Mexican government would want to remove the bodies of the deceased seamen and conduct an investigation, he concluded that the vessel would definitely have to be removed. Mollman sent a telex to Protexa dated December 17, 1985, suggesting that if the wreck were to be raised and moved, an immediate investigation should commence to determine if the removal was compulsory by law. The telex advised that a valid order of removal would have to be in writing and issued by an authorized governmental authority.
 
 
 7
 Immediately after the sinking, the Mexican Procuraduria General de la Republic ("PGR"), ordered an investigation due to the great loss of life involved. On December 17, 1985, the Mexican Port Captain for Ciudad del Carmen and the offshore port of Cayo Arcas issued a written order that, according to the English translation, required Protexa to post a bond "to guarantee the cleaning up of the area and the salvaging of [the] Vessel." App. at 1407. All underwriters, including AAMS and CIGNA/AFIA, were notified of the order by EII.
 
 
 8
 Protexa interpreted the Port Captain's order as requiring immediate removal of the wreck. The Port Captain's order was referred to Protexa's legal counsel, Jorge Uriarte, for review. After a 45-minute review, Uriarte concluded that "it was clear beyond a doubt that the order had to be complied with." App. at 1166. Uriarte visited the office of the Port Captain in an effort to obtain suspension or rescission of the order but was informed that any such relief would have to be sought from officials in Mexico City. He was also informed that the Port Captain expected removal to begin without delay or the navy would take over the removal and Protexa would be punished to the full extent of the law. In addition to providing Protexa with an opinion as to the validity of the removal order, Uriarte listed five potential consequences that could result from noncompliance: 1) if Protexa did not begin removal of the vessel immediately, the Mexican government could arrange to have the wreck removed and could present Protexa with the bill; 2) Protexa faced the potential for catastrophic liability to third parties for any damage resulting from movement of the wreck within the oil field; 3) Protexa would face potential sanctions or fines, which could be imposed on a sliding scale, for failure to comply with the removal order and cooperate with the investigation; 4) Protexa risked forfeiture of the vessel and the bond; and 5) Protexa risked the destruction of its goodwill with the government and with PEMEX if it failed to comply with the order. After concluding that the removal order was valid and after weighing the potential consequences of non-compliance, Protexa did not challenge the order.
 
 
 9
 On the same day that the order was issued, Pablo Cruz ("Cruz"), Protexa's representative, notified Mollman and requested an immediate meeting so that EII could present the removal order to the underwriters. Cruz also wanted to present Protexa's proposal to perform the removal without resort to a third-party salvor.
 
 
 10
 Mollman, Tyssen, and Cruz met in Houston on December 18, 1985. They all agreed that it appeared that the removal was required and that Protexa's proposed plan was sound. In Mollman's opinion, it made sense for Protexa to remove the wreck, since the project primarily involved diving and lifting and he considered Protexa to have an abundance of expertise and equipment for this type of operation. Mollman also was aware that preliminary reports indicated that the Huichol II was quickly sinking into the mud. Mollman attempted to telephone the underwriters but was able to contact only three of them. He was not able to reach AAMS or the Lloyds/London underwriters. To those underwriters that were reached, Mollman explained the circumstances of the removal order and the need for beginning wreck removal without delay in order to minimize expenses. These underwriters agreed to waive any requirement that Protexa obtain a second or third salvage bid and advised that Protexa should begin work immediately to avoid further complications and costs.[3]
 
 
 11
 Protexa presented the underwriters with two alternatives regarding the costs of removal: 1) a fixed-sum bid to remove the wreck for $3,785,000 or 2) a daily rate of $224,608 for an estimated period of 24 days, resulting in a cost of approximately $5.4 million. Tyssen sent these orders to the underwriters by telex on December 19, 1985.
 
 
 12
 By December 20, 1985, all of the underwriters except AAMS and CIGNA/AFIA had agreed to the lump-sum bid assuming that there was a consensus in favor of this option. AFIA took no position and AAMS, instead of accepting either of the alternatives posed by Protexa, responded by advising that all necessary steps should be taken to minimize the loss and expressed its desire to have a third-party salvor involved, as much as possible, in the removal of the wreck. Since AAMS and CIGNA/AFIA had not approved the lump-sum basis, Mollman and Tyssen told Protexa that it should consider the job to be on a day-rate basis.
 
 
 13
 The wreck removal operation began on December 19, 1985, and Tyssen initially estimated that it would take about three weeks to remove the vessel and transport it to an approved location. Protexa's original plan involved passing slings under the wreck using cranes, but problems developed. According to Cruz, a ship passing through the area during a storm snagged the Huichol II with its anchor, the wreck shifted, and debris lodged under the wreck, making passage of the slings underneath impossible. Protexa then decided to tunnel under the wreck in order to pass the slings, but progress was exceedingly slow.
 
 
 14
 During mid-January, AAMS transmitted a series of telexes voicing concern about the expense of the wreck removal, and AAMS's adjuster at the scene recommended that the salvage operation be placed out for competitive bids. A third-party salvor, Smit International, contacted RJA and Mollman and offered to perform the removal. However, Smit was not invited to bid until late January, at which time it offered to perform the removal under an agreement calling for it to receive $1.125 million if the job was successfully completed. On the recommendation of AAMS's adjuster on site, a professional salvage master, Alex Rynecki, Inc., was hired to assist Protexa. A Rynecki employee found that the basic salvage plan was sound, but he criticized its implementation, and he made a number of recommendations that were never carried out. He advised Cruz that the only way to determine the reasonable cost for the wreck removal operation would be to secure competitive bids, and he estimated that a commercial salvor would bid between $1.1 million and $2.9 million.
 
 
 15
 After struggling with the removal operation for about 45 days, Protexa finally lifted and suspended the wreck in a crane on February 10. Recovery of the bodies began but was interrupted by bad weather. Eventually the wreck was placed back on the sea bottom in shallow water outside the PEMEX oil exploratory zone.
 
 
 16
 After removal was completed, RJA prepared its final proof of loss and forwarded copies to all underwriters. The total adjusted loss was $12,121,726. The first $2,500,000 of that loss was paid by the primary-layer underwriters, leaving a balance of $9,631,726, 5% of which remained with the Mexican insurer. The Lloyds/London underwriters, which satisfied Protexa's claim, owed 65% of 95% of $9,631,726, or $5,947,591. Thus, AAMS, if liable, would owe 30% of 95% of $9,631,726 or $2,745,042. CIGNA/AFIA would owe 5% of 95% of $9,631,726, or $507,000. As part of its final report, RJA again reviewed the authority of the Mexican government to order removal and was convinced that the order was valid and required the plaintiff to remove the wreck. Both AAMS and CIGNA/AFIA, however, denied Protexa's claim.
 
 
 17
 Protexa filed a complaint in the United States District Court for the District of New Jersey. Protexa subsequently moved for summary judgment, contending that the removal costs were recoverable because the removal was "compulsory by law." Relying on cases construing this standard policy language, Protexa argued that the Port Captain's order alone established conclusively that the removal was "compulsory by law." Protexa also maintained that the "act of state" doctrine precluded the court from deciding whether the Port Captain possessed the authority to order this removal.
 
 
 18
 The insurance companies filed cross-motions for summary judgment. They argued that the cases adopted "a balancing test of reasonableness in which three factors: the likelihood of exposure, the sanctions for failure to remove, and the cost of removal, must all be examined in order to determine if removal was, in fact, 'compulsory by law.' " App. at 40. Thus, they maintained that even a valid removal order would not conclusively show that removal was "compulsory by law." They argued, however, that the Port Captain's order in this case was invalid, and that therefore "the likelihood of exposure to sanctions for failure to remove should be considered a nullity." Id. at 40-41. They also contended that the act of state doctrine did not apply under the circumstances of this case.
 
 
 19
 The district court denied both motions for summary judgment and adopted an intermediate interpretation of the phrase "compulsory by law." Under the court's interpretation, neither the validity nor the invalidity of the Port Captain's order was dispositive, and consequently the court concluded that it was unnecessary to confront the order's validity or the act of state doctrine. Instead, the court held that removal was "compulsory by law" if a reasonable shipowner would have concluded that the cost of the removal was less than the probable sanctions for nonremoval. The court concluded that, in assessing the probable sanctions for nonremoval, it was necessary to take into account the likelihood that the Port Captain's order would have been sustained if challenged. Id. at 41.
 
 
 20
 After a bench trial, the court entered judgment for the insurance companies on two independent grounds. The court first held that the removal was not "compulsory by law" under the formula it had previously adopted. The court stated that "no phrase in the body of the [Port Captain's] Order direct[ed] wreck removal." Grupo Protexa, S.A. v. All American Marine Slip, 753 F.Supp. 1217, 1232-33 (D.N.J.1990). Instead, the court observed, the order required the posting of a bond. Id. at 1233. The court suggested that Protexa did not adequately consider the possibility of challenging the Port Captain's order, since Uriarte had no training in the applicable areas of law, did not obtain expert advice, concluded that the order was valid after only cursory review, and was not properly prepared when he met with the Port Captain. Id. at 1233-34. In addition, the court found that the potential sanctions for noncompliance with the order and the potential liability to third parties were much less than the cost of removal. Id. at 1236; see also id. at 1235. Finally, the court suggested that factors other than legal compulsion--pressure from the families of the deceased seamen and the possible commercial consequences of noncompliance--influenced Protexa's decision not to resist the Port Captain's order. Id. at 1232.
 
 
 21
 The court next held that, even if the removal had been "compulsory by law," Protexa was not entitled to recover due to a policy provision that the court interpreted to mean that Protexa lost all right to recovery if it breached its duty to act as a prudent uninsured. The court found that Protexa violated this duty "[w]hen [it] acted as its own salvor." Id. at 1237. Among other things, the court noted that "Protexa had no experience in deep water wreck removal operations," ignored AAMS' request that a third-party salvor be involved as much as possible, ignored bids by experienced salvors that were much lower than Protexa's costs, did not properly execute its removal plan, and failed to implement recommendations by an experienced salvor. Id. at 1237-39. Protexa appealed. We have jurisdiction under 28 U.S.C. § 1291.[4]
 
 II.
 
 22
 The first question that we must decide is whether the removal of the Huichol II was "compulsory by law." In addressing this question, both sides rely primarily on four cases decided by the courts of appeals construing the phrase "compulsory by law" as used in a standard clause in marine insurance contracts. Both sides appear to agree, as the insurance companies argue, that these decisions "were well-known in the marine insurance community and had been thoroughly discussed in the marine insurance literature." Appellees' Br. at 24. Consequently, the parties to the insurance policy at issue here "will be presumed to have intended [these] words to have their proper legal meaning and effect, in the absence of any contrary intention appearing in the instrument." Raulie v. United States, 400 F.2d 487, 521 (10th Cir.1968) (quoting 17A C.J.S. Contracts § 586.)
 
 
 23
 After reviewing the decisions on which the parties rely, we conclude that Protexa's construction of the phrase "compulsory by law" is correct and that the district court's construction is mistaken. It is abundantly clear that the district court's interpretation is inconsistent with that of the Second Circuit in Seaboard Shipping Corp. v. Jocharanne Tugboat Corp., 461 F.2d 500 (2d Cir.1972). In that case, a barge carrying gasoline went aground in Lake Ontario immediately offshore Oswego, New York, and began leaking gasoline into the water and onto the adjacent shoreline. The Second Circuit rejected the argument that "the pressure from the Coast Guard and other governmental authorities in the Oswego area made the removal of the barge compulsory." Id. at 504. The court held that " 'compulsory removal' is a term of art referring to a situation in which a hull ... pursuant to government order ... must be removed from navigable waters." Id. Since no such government order had been issued in that case, the court held that the costs of removal were not recoverable under the insurance policy. In the present case, by contrast, if we assume, as the district court did, that the order of the Port Captain was a valid order requiring removal, then the cost of removal would clearly be recoverable under the Second Circuit's interpretation.
 
 
 24
 The Fifth Circuit adopted a different interpretation of the phrase "compulsory by law" in Progress Marine, Inc. v. Foremost Ins. Co., 642 F.2d 816 (5th Cir.), cert. denied, 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981). In that case, a barge sank about eleven miles off the Louisiana coast. Although no government order was issued requiring removal, the "hurricane season was approaching and the submerged barge posed a threat to neighboring oil production facilities and workers." Id. at 817. Moreover, the barge "lay only eight feet below the surface of the water and posed a threat to navigation in the area, as [the barge owner] was clearly informed by the Coast Guard." Id. (footnote omitted). The insurance company argued that "the removal, although perhaps compelled by prudence, was not 'compulsory by law' as required by the express terms of the policy." Id. The Fifth Circuit rejected this argument. The court disagreed with the Second Circuit's view that "removal 'compulsory by law' requires a peremptory order by an authoritative government agency." Id. at 819 (emphasis added). The court added that this phrase "should not be viewed as restricted to situations in which an express direct order from a governmental body directs removal." Id. at 820 (emphasis added). The court stated:
 
 
 25
 [R]emoval occasioned by an unarticulated or unreasonable apprehension of criminal or civil liability could not be considered "compelled by law." On the other hand, where removal was reasonably required by law, or where failure to remove would have reasonabl[y] exposed an insured to liability imposed by law sufficiently great to justify the expense of removal, then, we believe, such removal could be considered "compelled by law" for purposes of recovery.
 
 
 26
 Id.
 
 
 27
 Finally, the court observed that an assured would have to possess "a subjective belief ... that [removal] was reasonably necessary." Id. The court remanded the case before it for application of this new standard.
 
 
 28
 We do not interpret the Fifth Circuit's opinion in this case as rejecting the Second Circuit's view that removal is "compulsory by law" when required by a direct government order. Rather, we interpret the Fifth Circuit's opinion to mean that removal may also be considered "compulsory by law" in the absence of such an order when a ship owner subjectively and reasonably believes that removal is necessary based on a comparison of the probable cost of removal against the probable liability if removal is not undertaken. In the present case, therefore, if the Port Captain's order was a valid removal order (as the district court assumed), then the removal of the Huichol II would satisfy the first prong of this test.
 
 
 29
 Two years after Progress Marine, the Fifth Circuit, sitting in banc, returned to the same question in Continental Oil Co. v. Bonanza Corp., 706 F.2d 1365 (5th Cir.1983). In that case, Conoco time-chartered a vessel from Bonanza Corporation, which retained exclusive control of the vessel. While maneuvering the vessel near a Conoco oil drilling rig in an area leased from the United States, the captain negligently caused the vessel to sink directly beneath the rig. Conoco subsequently removed the vessel and attempted to recover the removal costs under an insurance policy containing a clause similar to that at issue in the present case.
 
 
 30
 The in banc Fifth Circuit reaffirmed the interpretation set out in Progress Marine, with one exception not relevant here. Again rejecting the Second Circuit's interpretation, the Fifth Circuit stated that "[r]estricting 'compulsion' to the mandate of a governmental agency rather than according it the usual significance of the generalized command of a statute or judicial decision narrows the meaning of the term considerably and, we think, unjustifiably." Continental Oil, 706 F.2d at 1369 (emphasis added). "Compulsion," the court wrote, "is not exerted only by direct command." Id. (emphasis added). The court stated that it was "unable to restrict the meaning of 'compulsory' to acts performed in response to order." Id. (emphasis added). Rather, the court stated:
 
 
 31
 Practical considerations also indicate that removal should not be considered compulsory by law only after specific mandate has issued. If removal were compulsory by law only after competent governmental authority had given its edict, then the vessel owner who removed a vessel he had negligently sunk could not recover the costs of removal even after other vessels had run aground on the wreck until some governmental agency gave the peremptory command. The owner (and consequently its insurer) would be exposed to repeated damage claims without being able to rely on policy coverage to eliminate the hazard, unless a governmental agency ordered removal....
 
 
 32
 Thus, the clause should be so construed that removal does not become compulsory by law only when a court has rendered judgment requiring it or when an official has issued a fiat. This does not mean that any removal undertaken to minimize possible exposure to legal liability is covered.... To be compelling, the duty must be clear and the sanctions for its violation both established and sufficiently severe to be impelling, that is to warrant the cost of removal....
 
 
 33
 In determining whether removal is legally compelled, we look to the state of affairs as they would appear to a reasonable owner under the circumstances.
 
 
 34
 Id. at 1369-70 (emphasis added).
 
 
 35
 The in banc court made only one alteration in the test adopted in Progress Marine; it eliminated the requirement that the insured subjectively believe that removal was reasonably necessary. Id. at 1371.
 
 
 36
 Applying this test to the case before it, the court concluded that the removal carried out by Conoco was not "compulsory by law" as a result of Conoco's obligations under its lease agreement or under the federal regulations in force at the time. Id. at 1371-72. Among other things, the court observed that "[t]he regulations imposed no present duty to remove the wreck." Id. at 1371. The court also held that there was no settled principle of law on which Conoco, as the mere time charterer of the vessel, could be held liable by any potential claimant for damage subsequently caused by the vessel and that the probability that any such damage would occur was "slight." Id. at 1373.
 
 
 37
 We interpret the in banc opinion in Continental Oil, like the earlier panel opinion in Progress Marine, to impose a two-part test under which removal is considered compulsory by law if either 1) the removal is directed by governmental order, statute, or regulation or 2) if removal is reasonable under a cost-benefit analysis taking into consideration the probable cost of removal and both the likelihood and amount of liability which could be imposed for failing to remove the wreck.
 
 
 38
 We addressed the meaning of the phrase "compulsory by law" in East Coast Tender Serv., Inc. v. Robert T. Winzinger, Inc., 759 F.2d 280 (3d Cir.1985). In that case, Winzinger obtained a license from the New Jersey Department of Environmental Protection ("DEP") to operate two barges on the Delaware River as a temporary loading facility. In February 1979, while covered by an insurance policy containing a clause similar to that at issue here, the barges were damaged in a storm. The policy expired at the end of March 1979, but Winzinger continued to operate the barges as a loading facility until September. In April 1980, Winzinger "received formal notice from the DEP" to remove the barges, which by that time had sunk into the river. Id. at 283.
 
 
 39
 In analyzing Winzinger's right to recover removal costs under the insurance policy, we adopted "the Fifth Circuit's more expansive interpretation of the term 'compelled by law.' " Id. at 286. We wrote that this phrase "in the context of this type of insurance policy should not be restricted to situations in which an express order from a governmental body directs removal." Id. (emphasis added). We held that Winzinger was not entitled to recover, however, because he did not incur any legal obligation to remove the barges until after the policy term had expired. Id. at 286-87.
 
 
 40
 In sum, we interpret all of the decisions described above to mean that removal is "compulsory by law" if it is directed by government order. Our decision in East Coast Tender Serv., and the two earlier Fifth Circuit decisions interpret this phrase to encompass additional cases, viz., those in which removal is required by statute or regulation and those in which a reasonable shipowner at the relevant time would determine that the probable cost of removal would be less than the probable tort liability if removal was not undertaken. Accordingly, if the Port Captain's order in this case was a valid removal order, Protexa was entitled to recover under the policy provision in question.
 
 III.
 
 41
 A. Under the correct interpretation of the phrase "compulsory by law," the meaning and validity of the Port Captain's order are critical factors. Relying on several statements in the district court opinion, the insurance companies contend that the district court "clearly concluded that the Port Captain's directive was not an order to remove the wreck." Appellees' Br. at 22. We disagree with this interpretation of the district court's opinion. The district court's opinion states expressly that the court would "assume, without deciding, that the Port Captain's removal order was valid" (Grupo Protexa, 753 F.Supp. at 1228), and the portions of the district court opinion on which the insurance companies rely do not find that the order did not require removal. Rather, these portions of the opinion merely point out--correctly--that the English translation of the order does not expressly require removal. It seems clear that the meaning of the Port Captain's order under Mexican law cannot be determined solely on a literal reading of the English translation, and we do not interpret the district court's opinion as taking such an approach.
 
 
 42
 Since the district court made no finding regarding the precise meaning of the Port Captain's order, we must remand for a finding on this question. In light of the parties' arguments on appeal concerning the admission of expert testimony about this order, we note that under Fed.R.Civ.P. 44.1, expert testimony may be received regarding Mexican law to aid in interpreting the Port Captain's order. Merck & Co., Inc. v. U.S. Int'l Trade Comm'n, 774 F.2d 483 (Fed.Cir.1985).
 
 
 43
 B. If the Port Captain's order, as understood under Mexican law, directed removal of the wreck, then the validity of the order may be dispositive. The insurance companies argue that under Mexican law and the United Nations Convention on the Law of the Sea (UNCLOS) (21 I.L.M. 1261), which Mexico has signed, the Port Captain lacked the authority to order the removal of the Huichol II from the location where it sank. In response, Protexa argues that the act of state doctrine precludes an American court from judging the validity of the order. See W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990), aff'g, Environmental Tectonics v. W.S. Kirkpatrick, Inc., 847 F.2d 1052 (3d Cir.1988). The insurance companies contend, however, that the act of state doctrine does not apply here because Protexa chose to sue in the United States rather than Mexico, where the validity of the order could have been fully litigated; because the Huichol II sank outside Mexico's territorial waters and the act of state doctrine does not apply to extraterritorial acts; and because unambiguous provisions of UNCLOS are controlling because they establish that the Huichol II is located outside Mexican jurisdiction.
 
 
 44
 The district court has not addressed any of these questions, and we believe it would be premature for us to do so now. As noted above, it is still unsettled whether the Port Captain's order in fact directed the removal of the wreck.[5] Until this preliminary question is decided, we should not decide (a) whether the act of state doctrine prohibits an American court from deciding whether the Port Captain possessed the authority to order removal of the wreck or (b) whether the Port Captain possessed such authority.
 
 IV.
 
 45
 The district court's second, independent reason for entering judgment for the insurance companies was that Protexa breached its duty to exercise the care of a prudent uninsured with respect to the removal operation. The court held that this breach prevented Protexa from recovering any removal costs under the policy, even the costs that would have been incurred had the removal been performed by a professional salvor. In reaching this conclusion, the district court relied primarily on a provision of the "protection and indemnity" portion of the policy. In passing, the court also cited one case for the proposition that an insured has a duty to exercise the care of a prudent uninsured under a "sue and labor" clause. Grupo Protexa, 753 F.Supp. at 1236-37. On appeal, both sides agree that cases involving "sue and labor" clauses are not relevant here. Thus, we turn to the policy provision on which the district court relied.
 
 
 46
 As noted, this provision appears in the "protection and indemnity" portion of the policy. App. at 1670-74. The provision follows the heading "GENERAL CONDITIONS AND/OR LIMITATIONS" and is captioned in the left margin "Settlement of claims." Id. at 1673. The provision reads as follows (the language on which the district court relied is highlighted):
 
 
 47
 The Assured shall not make any admission of liability, either before or after any occurrence which may result in a claim for which the Assurer may be liable. The Assured shall not interfere in any negotiations of the Assurer, for settlement of any legal proceedings in respect of any occurrences for which the Assurer is liable under this policy; provided, however, that in respect of any occurrence likely to give rise to a claim under this policy, the Assured are obligated to and shall take steps to protect their (and/or the Assurer's) interests as would reasonably be taken in the absence of this or similar insurance. If the Assured shall fail or refuse to settle any claim as authorized by Assurer, the liability of the Assurer to the Assured shall be limited to the amount for which settlement could have been made.
 
 
 48
 Whenever required by the Assurer the Assured shall aid in securing information and evidence and in obtaining witnesses and shall cooperate with the Assurer in the defense of any claim or suit or in the appeal from any judgment, in respect of any occurrence as hereinbefore provided.
 
 
 49
 Id.
 
 
 50
 Unlike the district court and the insurance companies, we do not interpret the highlighted language to mean that the assured's entire right to recover is conditioned upon the assured's acting at all times and in every respect as a prudent uninsured. First, it is significant that this language appears in a paragraph captioned "Settlement of claims." This placement suggests that whatever duty was created by the disputed language is restricted to the settlement of claims. Second, it is significant that the language in question appears in a proviso. This placement suggests that the language qualifies the duty imposed by the language preceding the proviso, i.e., the insured's obligation not to "interfere in any negotiations" carried on by the insurer. Thus, the most reasonable interpretation of the bare policy language was that Protexa was obligated to act as a prudent uninsured would with respect to any claims asserted by third parties. In other words, the proviso appears to be a cooperation clause. See Martin v. Travelers Indem. Co., 450 F.2d 542, 553 (5th Cir.1971); L. Buglass, Marine Insurance and General Average in the United States, 391 (2d ed. 1981); J.A. Appleman & J. Appleman, Insurance Law and Practice, § 4774 (1981). While the parties could have intended this provision to have some other meaning, no evidence establishing such an intent has been called to our attention.[6] Accordingly, we hold that this provision does not mean that Protexa's failure to act as a prudent uninsured during the removal operation would totally defeat Protexa's right to recover any removal costs.
 
 
 51
 It does not follow, however, that Protexa is entitled under the policy to recover all the costs that it incurred from what the district court found to be an extremely inefficient removal operation. Although the policy provision on removal does not expressly state that Protexa may recover only reasonable removal costs and expenses, "an interpretation which makes [a] contract or agreement fair and reasonable will be preferred to one which leads to harsh and unreasonable results." 4 S. Williston, A Treatise on the Law of Contracts § 620 (3d ed. 1961); see also 3 A.L. Corbin, Corbin on Contracts § 552 (1960); G.J. Couch, Couch on Insurance 2d § 15:16 (rev. ed. 1984). Thus, the policy provision on removal may well be restricted to reasonable removal costs, and it is not apparent from Protexa's briefs that it disputes such an interpretation. On remand, the district court should determine the meaning of this provision and, if the provision is limited to reasonable costs, make findings regarding the amount of those costs.[7] The district court has already found that Protexa's removal operation was highly inefficient, and we hold that those findings are not clearly erroneous.
 
 V.
 
 52
 In conclusion, we hold that the removal of the Huichol II was "compulsory by law" if removal was directed by a valid order of the Port Captain and that Protexa's inefficient removal operation does not totally preclude recovery of removal costs. We will therefore reverse the judgment of the district court and remand for further proceedings.
 
 
 
 *
 Hon. Daniel H. Huyett 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 PEMEX is a decentralized public agency of the Mexican Federal Government. It has rights to explore for oil and gas reserves in the exclusive economic zone. More than 50 oil drilling platforms and related structures belonging to PEMEX are located and operated in this zone
 
 
 [2]
 Underwriters generally receive their information from surveyors/adjustors who are hired to act as their operative at the scene of the wreck. In situations involving multiple underwriters the surveyor usually files general reports with the broker who in turn contacts the underwriters. Under no circumstances, however, is the surveyor authorized to enter into contracts on behalf of the underwriters or to commit underwriters to pay any sums in satisfaction of a claim
 
 
 [3]
 Prior to this meeting and telephone contact with the underwriters, Mollman sent Protexa a telex strongly suggesting that Protexa obtain at least one, and preferably two, outside bids for the salvage of the vessel. He also reminded Protexa of its obligation to act as a prudent uninsured
 
 
 [4]
 The district court entered an order extending the time within which the plaintiffs could file a notice of appeal, and the insurance companies filed a cross-appeal from this order. By prior order, we denied the insurance companies' request for dismissal of the plaintiffs' appeal on jurisdictional grounds
 
 
 [5]
 The act of state doctrine does not preclude a court from determining whether in fact a government official directed certain action. See Kirkpatrick Co., 493 U.S. at 409, 110 S.Ct. at 706-07; Interamerican Refining Corp. v. Texaco Maracaibo, Inc., 307 F.Supp. 1291, 1301 (D.Del.1970) ("whether or not a foreign official 'ordered' certain conduct is an evidentiary question" not prohibited by the act of state doctrine)
 
 
 [6]
 The insurance companies point to trial testimony by Pablo Cruz, Protexa's risk manager, and Keith Mollman, who was assigned as Protexa's account manager by Protexa's insurance broker. But assuming that these witnesses were competent to testify about Protexa's intent or the generally understood meaning of a clause of this nature in the industry, neither witness stated that this clause meant that the assured's right to any recovery was conditioned on acting at all times as a prudent uninsured. Cruz merely stated that Protexa had a general duty to act as a prudent uninsured, but he did not state that the consequence of any breach of this duty was the denial of all recovery. Mollman first stated that the policy did not expressly impose a general duty to act as a prudent uninsured but that this duty was understood. App. at 381. After the insurance companies' attorney pointed out the policy provision in question, Mollman agreed that the duty contained in the provision was "the same duty we were talking about." App. at 383. Without a contrary finding by the trial court, we are unwilling to interpret this testimony to mean anything more than that the policy provision in question embodied the duty to act as a prudent uninsured in the limited context of the settlement of claims
 
 
 [7]
 Protexa also contends that the district court erred in dismissing its waiver and estoppel defense with respect to its alleged breach of the cooperation clause. Because we hold that this clause does not apply to the manner in which Protexa conducted the removal operation, we need not address this argument. Finally, Protexa argues that it was not permitted to introduce evidence that the insurance companies waived or should be estopped from asserting the affirmative defense of failure to mitigate. The rulings to which Protexa refers appear to have been based on the district court's interpretation of the policy provisions discussed above. Thus our decision regarding the meaning of these provisions appears to obviate any need to address these rulings further