GRUPO PROTEXA, S.A.,
et al., Plaintiffs,

v.

ALL AMERICAN MARINE SLIP,
et al., Defendants.

Civ.A. No. 86–4212.

United States District Court,
D. New Jersey.

May 12, 1993.

---

Gerald Liloia, Kenneth Van Deventer, Riker, Danzig, Scherer, Hyland & Perretti, Morristown, NJ, for plaintiffs.

Harold K. Watson, Gregory F. Burch, Liddell, Sapp, Zivley & Hill, Houston, TX, and David J. D'Aloia, Saiber, Schlesinger, Satz & Goldstein, Newark, NJ, for defendants.

## OPINION

WOLIN, District Judge.

This is an insurance coverage case.[1] It involves the interpretation of the wreck removal provision of a marine insurance policy. The critical inquiry is whether the wreck removal was compulsory by law. Subsumed within that inquiry are a panoply of Mexican laws whose interpretation impact on the application of this policy provision. In a prior opinion, the Court held, after a bench trial, that the removal was not compulsory by law. *Grupo Protexa, S.A. v. All American Marine Slip,* 753 F.Supp. 1217, 1236 (D.N.J.1990). On appeal, the United States Court of Appeals for the Third Circuit rejected the analytical framework of the court and adopted the rationale set forth in *Seaboard Shipping Corp. v. Jockaranne Tug Boat Corp.,* 461 F.2d 500 (2d Cir.1972). In *Seaboard Shipping,* the Court held that " 'compulsory removal' is a term of art referring to a situation in which a hull ... pursuant to government order ... must be removed from navigable waters." *Id.* Likewise, the Third Circuit has stated that removal is "compulsory by law" if it is directed by governmental order. *Grupo Protexa, S.A. v. All American Marine Slip,* 954 F.2d 130, 138 (3d Cir.1992) ("*Grupo I* ").

To determine whether the removal in this case was compulsory by law, the Court must examine a document authored by the Port Captain for Cuidad del Carmen on December 17, 1985. While this writing is generically referred to as the Port Captain's Order, the parties vehemently disagree as to its status. Grupo Protexa, S.A. (Grupo) contends that it is an order that required immediate removal of the wreck. All American Marine Slip (AAMS) submits that the document amounted to nothing more than a notice to post a bond. AAMS advances several reasons why the writing is not an order and further asserts that, even if the Court were to construe it as an order, it is not a valid order in accord with statutory and constitutional precepts of the Republic of Mexico.

In the Court's original opinion, it did not decide whether the Port Captain's order was in fact a valid order of removal. Rather, the Court assumed, without deciding, that the Port Captain's removal order was valid. *Grupo,* 753 F.Supp. at 1228. Because the Court adopted the Fifth Circuit's cost-benefit analysis, it did not view a direct government order as an alternative basis to provide insurance coverage under the phrase "compulsory by law." *See Progress Marine, Inc. v. Foremost Insurance Co.,* 642 F.2d 816 (5th Cir.), *cert. denied,* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158 (1981); *Continental Oil Co. v. Bonanza Corp.,* 706 F.2d 1365 (5th Cir.1983). However, because the Third Circuit now interprets "compulsory by law" to include wreck removal by direct government order, the Court must determine if the Port Captain's order in this case was a valid removal order. *Grupo I,* 954 F.2d at 138. If the Port Captain's order was valid, then Protexa was entitled to recover under the policy provision in question. *Id.*

On remand and at the further proceedings anticipated by the Court of Appeals, each of the parties produced witnesses who had not previously given testimony on the status of the Port Captain's order. These witnesses were Miguel Angel Rebolledo, the Port Captain; Ignacio Melo, an expert in Mexican maritime law; Bernard Oxman, an expert in

---

1. To characterize this matter as an insurance coverage case understates the gravity of the occurrence wherein twenty-seven Mexican seamen lost their lives when the Huichol II sank in the Bay of Compeche on December 14, 1985. This significant loss of life occasioned a national day of mourning, and this Court is not unaware of the heightened sensitivities that surround this unfortunate event.

international law and the United Nations Convention on the Law of Sea (UNCLOS); Albert Szekely, an expert in Mexican law of the sea and UNCLOS; Francisco Alva Rosas, an acting Port Captain; and David Pockett, an expert in wreck removal and salvage operations.[2] Depositions of Pockett and Robert Umbdenstock were also read into the record. Thus, the case on remand and retrial appeared nothing like the initial hearing. The latter proceeding's central focus was the Port Captain's writing, commonly called the "Port Captain's order."

While it may seem that the Court of Appeals' mandate requires little more than a re-reading of the Port Captain's order, such is not the case. The Third Circuit noted, "The meaning of the Port Captain's order under Mexican law cannot be determined solely on a literal reading of the English translation...." *Grupo I,* 954 F.2d at 138. In the following analysis, the Court relies upon the relevant testimony of the witnesses, their interpretation of the Port Captain's order and their interpretation of the Mexican Constitution and the relevant statutes that regulate Mexico's coastal and international waters. Moreover, the Court incorporates by reference its prior findings of fact as set forth in *Grupo,* 753 F.Supp. 1217. Because the physical contours of this remand proceeding are markedly different from the first hearing, any factual discrepancy will be controlled by this Opinion.

Overarching the validity of the Port Captain's order is whether the Port Captain, as a representative of the Mexican government, possesses the authority to order a private citizen to raise and remove a wreck beyond Mexico's territorial sea without specific statutory authority enabling him to do so. Because Protexa was a private citizen when its vessel, the Huichol II (Huichol), sank and the sinking occurred outside of Mexico's territorial waters, this inquiry is especially appropriate.[3] Given that the Republic of Mexico models its Constitution after that of the United States, the due process inquiry is as relevant under the Mexican Constitution as it

would be under the United States Constitution.

The answer to the inquiry centers on the interplay between Mexico's exercise of its sovereign power in relation to the due process rights of its citizens. If the sovereign's exercise of power is unbridled or authorized by law, then the Port Captain's order is valid. If the Port Captain's order is in fact unauthorized by law or is proscribed in the constitutional sense, then the order is invalid.

## I. *DOCUMENTARY EVIDENCE*

### A. *The Port Captain's Order*

On December 17, 1985, the Port Captain of Cuidad del Carmen issued a written order. Its English translation was received in evidence as Exhibit 8. Because it still represents the ignition that sparks the engine of this litigation, the Court reproduces its text at length:

> SUBSECRETARIAT OF OPERATION DIRECTORATE GENERAL OF MERCHANT MARINE.
> OFFICE OF THE CAPTAIN OF THE PORT
> SECTION OF MARINE SHIPS
> OFFICIAL COMMUNICATION CP–3312–23–3350
> File. 1

OFFICE OF THE
CAPTAIN OF THE PORT
CALLE 20 No. 29
P.O. Box 24100

RE: This is a communication concerning salvage of the vessel 'HUICHOL' of your Company

> Cuidad del Carmen, State of Campeche
> December 17, 1985

TO;
CAPTAIN CARLOS H. MERINO GARCIA DE ALBA
CHIEF OF MARINE OPERATIONS OF THE COMPANY
"CONDUX", S.A. DE C.V.

---

2. Pockett testified in the prior proceeding. The thrust of his testimony at the earlier proceeding focused on Protexa's salvage operation.

3. Although the Huichol was owned by Protexa, it sailed under the flag of Panama.

AV. PERIFERICO 8 North

C I T Y.—

This Maritime Authority is pleased to resolve after analysis of the procedures conducted by it in connection with the sinking of National Motor Vessel ("Buque Motor de Posicionamiento Dinamico Nacional") named "HUICHOL" having the following characteristics: 499.83 gross tons, 151.57 net tonnage, registered in this Port under number 2623 and owned by your Company, (to) refer the following procedures to Higher Authority (in order) to request Expert Opinions from technical personnel and reports as to the causes that occasioned the sinking of said Vessel at the following coordinates marked by radar: Latitude 19° and Longitude 91° 58.5′ W., and therefore, based on the Sole Article published in the Official Newspaper ("Diario Oficial") of the Federal Government dated March 28 of this year and on Articles numbers 86 of the Law of Navigation and Maritime Commerce ("Ley de Navegacion y Comercio Maritimo") and 262 and 263 of the Law of General Means of Communication ("Ley de Vias Generales de Comunicacion"), requests that such Company "CONDUX" S.A. de C.V., deposit the sum of Pesos $10,000,000.00 (Ten Million Pesos and 00/100, Mexican Currency) to guarantee the cleaning up of the area and the salvaging of said Vessel, in addition to guaranteeing any damage or loss that may arise in the course of the salvage operations, hereby stating by way of clarification that such sum may be furnished by a Bond or Deposit of Guaranty ("Billete de Deposito") furnished by an Insurance Company to the name of the Treasury of the Federal Government and for availability to the General Directorate of the Merchant Marine, a term of 25 days from the date of notification of this resolution hereby being granted as provided in the above cited Article 86.

Respectfully,

The Captain of the Port,

s.)

CAP.ALT. I.G. MIGUEL A. REBOLLEDO GUIOT

(Seal of the United Mexican States)

(Seal of the Directorate General of Merchant Marine Office of the Captain of the Port Cuidad del Carmen, State of Campeche)

Copies: To the DIRECTOR GENERAL OF MERCHANT MARINE.—

For the information of Higher Authority.—

Respectfully.—

Jose Maria Ibarran No. 47.—

03900 Mexico, D.F.

In the body of this document reference is made to Article 86 of the Law of Navigation and Maritime Commerce and Articles 262 and 263 of the Law of General Means of Communication. The Law of Navigation and Maritime Commerce was enacted in 1963, while the Law of General Means of Communication was enacted in 1941. Because witnesses differed over the meaning of these statutes, other portions thereof will be referenced.

## B. *The Law of Navigation and Maritime Commerce (1963)*

### 1. *Article 86*

If a ship runs aground or sinks in a port, in an area considered as such in terms of the last paragraph of Article 33, or in a general waterway of communication, in a manner that constitutes a navigational obstacle or that affects navigation, it shall be removed within the period set forth by the Navy Department, by the owner, the ship owner, or by anyone with a legal interest in the ship; all of whom are severally liable for the fulfillment of this obligation. If the ship is not removed within the established period, the Department will make a cost evaluation which will serve as the basis to make, the claim of the corresponding rescue cost pursuant to the administrative execution proceedings established in the Federal Tax Code, and the Navy Department shall proceed by itself, or with the intervention of a third party, to carry out the necessary works to effect the removal.

#### 2. *Article 6*

Questions which may arise over the interpretation of ... what pertains to general means of communication by water ... shall be decided by the provisions of: a) This Law and other laws on communications by water and their regulations; as well as by the international treaties duly ratified by Mexico; b) The Law on General Means of Communication. . . .

#### 3. *Article 9, Paragraph III*

The general means of communication by water are the territorial seas and the *other waters of federal jurisdiction,* when they can be used for navigation. They include the works and installations which constitute the maritime or fluvial terminals and the areas necessary for providing port and maritime services.

(Emphasis supplied).

#### 4. *Article 33*

The locations of shorelines and of banks of rivers, lakes and estuaries that have not been declared ports, or that are under construction, will be considered ports for the application of the provisions of this Law with respect to vigilance, police and maritime accidents.

### C. *The Law of General Means of Communication (1940)*

#### 1. *Article 262*

In the event that of shipwreck, fire, collision, running aground, or of any other accident outside a port which affects the cargo, the crew or any other persons aboard, the captain shall proceed to conduct an investigation recording the events in the navigation diary, or binnacle substituting it, with an obligation to inform the maritime authorities upon arrival to port. If the accident occurs in the port, notice will of course be given to the maritime authorities, which will proceed to conduct the corresponding investigation informing the Communications Department as soon as possible. The latter may, if it is deemed appropriate, appoint two experts who will give an opinion on the cause of the accident and on any parties presumed responsible. Once the investigation is terminated the results thereof shall be turned over to the Federal District Attorney within the term of five days.

#### 2. *Article 263*

In the event of shipwreck within port, or in the vicinity [vicinity] [proximity] thereof provided it affects the port, the owner or any interested company shall proceed to remove the wreck within the period set forth by the Harbormaster's office; provided, however, that the provisions of Article 47 hereof will apply in the event that there is a refusal to carry out the necessary works.

#### 3. *Article 1*

I. The territorial waters, in the extent and terms established by law and by international law;

II. The floatable and navigable rivers as well as the floatable and navigable tributaries, provided they are in any of the following cases:

a) Whenever they terminate in the sea, or in a lake, lagoon, or a stream of the kind referred to in the following section;

b) Whenever they serve totally or partially as a geographic border for the national territory, or between two or more states;

c) Whenever they cross from one state to another;

d) Whenever they cross the border of another country.

III. Floatable or navigable lakes, lagoons, and streams, provided they comply with any of the following requirements:

a) Whenever they communicate permanently or at times with the sea;

b) Whenever they are connected with constant water courses.

c) Whenever they serve totally or partially as a geographic border for the national territory, or between two or more states;

d) Whenever they cross state lines;

e) Whenever they cross the border of another country.

IV. Channels destined or to be destined for navigation whenever they fall into any of the cases described in Sections II and III hereof.

## D. Administrative General Regulations for the Police of Ports (1941)

### 1. Article 33

The Chief of the Police of the Port shall compel the patrons or owners of the vessel sinking within a port (or in places which interrupt navigation), to float them, to remove them or to destroy them within a reasonable time limit after which, if the order has not been observed, the Federation shall proceed to its destruction or auction, without such measure exempting the Captain, patron or owner of the vessel from the payment of the expenses incurred, nor from the obstruction fine that maybe imposed on them. . . .

## E. The United Nations Convention on the Law of Sea (UNCLOS)

### 1. Article 55—Specific Legal Regime of the Exclusive Economic Zone

The exclusive economic zone is an area beyond and adjacent to the territorial sea, subject to the specific legal regime established in this Part, under which the rights and jurisdiction of the coastal State and the rights and freedoms of other States are governed by the relevant provisions of this Convention.

### 2. Article 56—Rights, Jurisdiction and Duties of Coastal State in the Exclusive Economic Zone

1. In the exclusive economic zone, the coastal State has:

(a) sovereign rights for the purpose of exploring and exploiting, conserving and managing the natural resources, whether living or non-living, of the waters super adjacent to the sea-bed and its subsoil . . .

(b) jurisdiction as provided for in the relevant provisions of this Convention with regard to:

(i) the establishment and use of artificial islands, installations and structures;

\*    \*    \*    \*    \*    \*

(iii) the protection and preservation of the marine environment;

(c) other rights and duties provided for in this Convention.

### 3. Article 60—Artificial Islands, Installations and Structures in the Exclusive Economic Zone

1. In the exclusive economic zone, the coastal State shall have the exclusive right to construct and to authorize and regulate the construction, operation and use of:

\*    \*    \*    \*    \*    \*

(b) Installations and structures for the purposes provided for in article 56 and other economic purposes;

(c) Installations and structures which may interfere with the exercise of the rights of the coastal State in the zone.

2. The coastal State shall have exclusive jurisdiction over such artificial islands, installations and structures, including jurisdiction with regard to customs, fiscal, health, safety and immigration laws and regulations.

3. Due notice must be given of the construction of such artificial islands, installations or structures and permanent means for giving warnings of their presence must be maintained. Any installations or structures which are abandoned or discussed shall be removed to ensure safety of navigation, taking into account any generally accepted international standards established in this regard by the competent international organization. . . .

4. The coastal State may, where necessary, establish reasonable safety zones around such artificial islands, installations and structures in which it may take appropriate measures to ensure the safety both of navigation and of the artificial islands, installations and structures.

### F. *The Mexican Constitution*

#### 1. *Article 16*

Article 16 of the Mexican Constitution provides that "no one may be bothered in his person, family, domicile, papers or possessions, except by means of written order issued by a competent authority providing the basis and the reasons of the legal cause for the proceedings." The Mexican Supreme Court has interpreted this article to provide:

> According to Article 16 of the Federal Constitution, all acts of authority must be properly and sufficiently based and reasoned; the former meaning, that the legal provision applicable to the case must be mentioned in a precise manner; and the latter meaning, *that the special circumstances, particular reasons or immediate causes which were taken into consideration for the issuance of the act of authority, must also be mentioned in a precise manner* . . . .

Published in the Appendix to the "Seminario Judicial de la Federacion" (Weekly Judicial Gazette of the Federation) 1917–1985, Third Part, Second Chamber, Number 373, pages 636 and 637 (emphasis added). Moreover, the Court further explained, "[t]he responsible authorities do not comply with the Constitutional obligation of giving the legal foundation and duly reasoning the resolutions they issue by expressing the factual reasons and the legal considerations on which they have [been] based, whenever all of the foregoing appears in a different document." *Id.,* Eighth Part, Thesis Common to the Plenum and Chambers, Number 153, pages 248 and 249. Defendants' Brief at 3.

## II. *TESTIMONIAL EVIDENCE*

### A. *Miguel Angell Rebolledo*

Miguel Angell Rebolledo is the Port Captain for the Ports of Carmen and Cayos Arcos. Tr. 27 at 15.[4] He has been the Port Captain for approximately ten years. With the Port Captain's permission, the Huichol anchored in an anchor-prohibited zone due to bad weather. Tr. 29 at 4; Tr. 31 at 15; Tr.

34 at 2. Additional reference should be made to the black-lined area in Exhibit 206.[5] Anchorage is prohibited because of the presence of oil platforms and submerged oil pipelines. Tr. 29 at 9; Tr. 30 at 5. The Huichol sank approximately forty-five miles from the Port of Carmen and beyond the twelve-mile limit, which denotes Mexico's territorial sea. The wreck of the Huichol lay in waters that comprise the Exclusive Economic Zone (EEZ). Additional reference should be made to the blue-lined area in Exhibit 206. Although the EEZ rests within international waters, Mexico may exercise its sovereign right to explore, exploit, conserve and manage the natural resources located within the EEZ. Tr. 29 at 12. As Port Captain, Rebolledo has limited jurisdiction over the waters of the EEZ. Tr. 33 at 15. He is primarily concerned with the safety of the area. Tr. 35 at 4.

At the direction of the Marine Mercante, Captain Rebolledo issued the order, *see* Exhibit 8, on December 17, 1985. Tr. 43 at 11; Tr. 44 at 9. He tendered several justifications for why he wrote the order. The main reason was the Huichol's location in a high safety zone. Tr. 40 at 24; Tr. 50 at 18. It was Rebolledo's opinion that all wrecks in a high safety zone must be removed. Moreover, because the Attorney General had commenced an investigation, the Captain believed that removal was required. Tr. 54 at 16. If the Port Captain were unable to provide reasons for the Huichol's sinking, the wreck had to be raised, in the opinion of the Port Captain, to permit the Attorney General to make this determination. Tr. 42 at 14; Tr. 55 at 15. Rebolledo communicated to the Federal Prosecutor that a probable cause determination as to the reasons for the sinking should be reserved until after a visual and physical inspection of the ship. Tr. 57 at 21. The Port Captain also felt that the location of the wreck was in an area that affected the Port of Carmen. Tr. 52 at 20. Because of the loss of life, tremendous pressure existed to immediately recover the bodies of the crew. Tr. 52 at 1; Tr. 79 at 1. The sinking of the Huichol and the loss of life that oc-

---

4. Tr. 27 at 15 refers to trial transcript page and line.

5. A prototype of Exhibit 206 has been prepared by the Court and is attached as Exhibit A.

curred was a tragedy of such magnitude that it precipitated a national day of mourning. Tr. 73 at 25. As a result, it was important politically to commence removal without delay. Tr. 81 at 14.

Captain Rebolledo relied on the Law of Navigation and Maritime Commerce and the Law of General Means of Communication as the legal basis for this order. Tr. 46 at 24. Despite his concern for safety and his opinion that the Huichol constituted an obstacle to maintenance activity in the oil field, Tr. 53 at 2, 9, no technical analysis as to potential movement of the wreck, threat to existing oil pipeline and structures, and environment impact was performed prior to issuance of the order.[6] Tr. 63 at 24; Tr. 64 at 1–5. Nor did Petroleos Meicanos (PEMEX) exert any pressure for wreck removal. Indeed, it was Captain Rebolledo who attempted to pressure PEMEX and enlist their cooperation. Tr. 73 at 8. Moreover, prior to his issuance of the order, he was never told by Protexa that the Huichol was rapidly sinking in the mud. Tr. 81 at 25. Lastly, the Huichol wreck lay more than five hundred meters from any oil platform. Tr. 89 at 19.

When questioned about the language of the order and the absence of explicit statements that the wreck was a hazard to navigation or a detriment to the marine environment, Captain Rebolledo answered that it is not necessary to recite the pertinent portion of the Articles word-for-word and that the entire document contains an order to raise the wreck. Tr. 90 at 11; Tr. 91 at 8. The directive to remove the Huichol is in the whole document. Tr. 36 at 18.

Captain Rebolledo acknowledged that there is a difference between geographic supervision and subject matter jurisdiction of the Port Captain. Tr. 67 at 13. His jurisdiction over the EEZ exists by virtue of presidential decree. Tr. 68 at 1. His authority and control within the EEZ, however, is only as authorized by law. Tr. 70 at 11.

The Court finds that Captain Rebolledo believed that he had jurisdiction to issue the order of December 17, 1985 and that he intended Exhibit 8 to serve as a wreck removal order.

### B. *Ignacio Melo*

Ignacio Melo is a well-respected admiralty lawyer who has provided legal advice on varying facets of wreck removal approximately twenty-five to thirty times. Tr. 102 at 3. In his opinion, the Port Captain's order was valid. Tr. 105 at 20. The intent of the order to remove the wreck is clear and does not require sacramental words. Tr. 107 at 12–19; Tr. 108 at 1. Although he admitted that the Huichol sank in the EEZ outside of the twelve-mile territorial water limit, the Port Captain may still order wreck removal. Melo based this opinion on Mexico's maintenance of sovereignty over the EEZ. Tr. 111 at 4. He pointed to Articles 56 and 60 of UNCLOS as authority for removal because Mexico signed UNCLOS and incorporated it into its internal law. Tr. 111 at 16; Tr. 114 at 7–16.

He acknowledged that Article 86 of the Law of Navigation and Maritime Commerce (1963) refers only to territorial waters because it was written prior to the concept of the EEZ. Tr. 117 at 7. However, because Article 9 includes other waters of federal jurisdiction, Melo believed that the EEZ is a general means of communication by water. Tr. 119 at 5; Tr. 120 at 8–17. Furthermore, the phrase "other waters of jurisdiction" as used within Article 9 means waters that Mexico has jurisdiction over, not waters that Mexico necessarily owns. Tr. 206 at 24.

The legal basis for Melo's approval of the Port Captain's reliance on Article 263 is the language "provided it affects the port." While Article 86 requires a hazard posed to navigation as a prerequisite to this Article's applicability, Article 263 does not. Tr. 123 at 2. He interpreted "affects the port" in an economic sense by associating the oil field

---

**6.** Pockett testified that oil exploration companies such as PEMEX prepare and maintain charts where oil pipelines are laid. T. 584 at 21. No testimony was provided to demonstrate whether the Port Captain sought access to these charts. Seemingly, a review of these charts would impact on the threat of damage to submerged pipelines, as well as the associated environmental risk.

activity with the commerce in the Ports of Carmen and Cayos Arcos. Tr. 123 at 19; Tr. 124 at 6.

His reliance on Article 262 as appropriate statutory authority for a wreck removal order arose from the Port Captain's ability to commence an investigation. Tr. 126 at 11–23. He related the right to investigate and the right to issue an order of wreck removal as concepts of public order to be handled by the government. Tr. 127 at 17.

Lastly, Melo opined that administrative review was not available to Protexa and that Melo would not have brought an Amparo action in the Mexican courts on Protexa's behalf. Tr. 129 at 15; Tr. 133 at 4. He also rejected the use of the Fortuna Del Mar doctrine as too risky. Tr. 136 at 5.[7]

Melo conceded at trial that, according to the Mexican Constitution, a statute must exist before the government can order an individual to engage in a given act. Tr. 151 at 18. Additionally, sufficient facts must exist to invoke the statute's application. *Id.* at 10.

In a discussion on jurisdiction, he distinguished between the subject matter jurisdiction of the Port Captain and the geographical limits of the port's jurisdiction. Tr. 160 at 17; *see generally* Tr. 152–59. Moreover, he noted that the geographical jurisdiction of the port arises from Presidential Decree. Tr. 160 at 1. Most notably, the limits of the port are the limits of pilotage. *Id.* at 14.

When pressed on cross-examination as to the validity of the order, Melo was satisfied that the order's reference to the sinking ship and its recitation of specific laws fulfilled the mandate of Article 16 of the Constitution. Tr. 168 at 1–14. He refused to accept Article I of the Law of General Means of Communication as a limitation of what constitutes a general means of communication by water. In support of his view, he explained that Article I has been abrogated by Article 9, paragraph III of the Law and Navigation and Maritime Commerce. Tr. 177 at 10–22; Tr. 178 at 1–11.

Because the Huichol was of Panamanian registry, the law of the flag has primary authority over the vessel. Tr. 181 at 7. Melo stressed that Mexico would not be prohibited from the investigation of a foreign flag vessel in waters covered by Mexican jurisdiction pursuant to Article 262. Tr. 182 at 5; Tr. 184 at 3. Wreck removal under Article 262 would be inappropriate, however, unless removal is necessary for investigation. Tr. 184 at 3.

Given that the Port Captain did not cite to UNCLOS in his order, Melo assumed that the Port Captain apparently did not rely on UNCLOS for the order's validity. Tr. 190 at 5–15. Additionally, although Articles 263 and 86 did not mention the EEZ, it is well known and accepted that the government can order wreck removal despite the government's lack of physical capacity to remove a wreck. Tr. 191 at 10; Tr. 196 at 19.

## C. *Bernard Oxman*

Bernard Oxman is a Professor of Law at the University of Miami. Tr. 221 at 24. He is an acknowledged expert in international law and the law of the sea. Tr. 227 at 12. He concluded that the Port Captain's order was not a violation of international law. Indeed, in his opinion, the order was consistent with Mexico's rights and duties under international law. *Id.* at 21. From an international point-of-view, Professor Oxman did not focus on Mexico's statutes but rather Mexico's behavior as a coastal state in international waters. Tr. 230 at 13. Professor Oxman cited several reasons to demonstrate that the Port Captain's order was consistent with international law. Tr. 231 at 2. His reasons follow:

1. Because the Huichol was owned by Mexican nationals, the state may regulate their behavior. *Id.* at 7.

2. Because the Huichol supported exploration and exploitation activity in the EEZ, Article 56 of UNCLOS permits regulation of such activity. *Id.* at 22; Tr. 232 at 2; Tr. 233 at 4.

3. The exercise of Mexico's sovereign rights in the EEZ provides it with the right

---

7. Fortuna Del Mar permits an owner to abandon the vessel to the government without the attach-

ment of liability, provided the vessel sank as a result of nautical and not personal fault.

to control an activity if such activity affects the zone. Tr. 234 at 24; Tr. 236 at 2.

4. Mexico also may act to protect navigation rights if Mexico judged the Huichol wreck as a substantial hazard to navigation. Tr. 236 at 19.

5. Given the proximity of submerged oil pipelines and oil platforms, a serious potential environmental risk exists. A coastal state such as Mexico may take action to prevent or mitigate the grave and imminent danger of oil pollution. Tr. 236 at 19–25; Tr. 237 at 1–10. This is especially true when the assessment of potential catastrophe risk is made under emergent circumstances. Tr. 237 at 13; Tr. 238 at 11. Private parties must obey the government's order even if the government exceeds its authority. Any claim for the exercise of excessive authority rests with the flag state—Panama in this case. Tr. 239 at 11–25; Tr. 240 at 1.

6. Although not a basis of jurisdiction, Professor Oxman recognized the interest of Mexico in the recovery of the remains of its nationals. Tr. 246 at 3.

7. Given that ships of foreign flag states are free to traverse the waters of the EEZ without limitation, Mexico may exercise its sovereign jurisdiction to protect the interests of the flag state. Tr. 247 at 18.

8. International law abhors legal vacuums. If Mexico did not deal with the problem, who else would? Tr. 249 at 20; Tr. 250 at 4.

Cognate to his concern over the existence of a legal vacuum under international law, Professor Oxman believed that local statutes are to be construed consistent with the coastal state's international obligations. Thus, if two constructions of a statute are possible, the construction consistent with international law is preferred. Tr. 251 at 1; Tr. 252 at 9. Professor Oxman, however, was unwilling to agree that the statutes before the Court must be interpreted under international law as permitting wreck removal in the area of the EEZ. If two reasonable constructions were possible, then international law prefers a construction that would permit Mexico to meet its obligations without necessarily amending its statutes. Should the statutes be interpreted as inapplicable beyond the twelve-mile limit, then the Mexican legislature will have to enact a new statute to meet its international obligations. Tr. 252 at 23—Tr. 253 at 15. Additionally, Mexico's application of territorial sea law to the EEZ would not violate international law unless Mexico exceeds its jurisdiction by its interference with another state's rights. Tr. 256 at 15; Tr. 257 at 24.

At the close of his direct testimony, Professor Oxman concluded that within the purview of Articles 56, 58 and 59 of UNCLOS, the order of removal did not violate international law. Tr. 261 at 2—Tr. 269 at 8.

On cross-examination, Professor Oxman was unable to render a professional opinion on whether the Mexican statutes in question construed properly under Mexican law would impose obligations on private citizens to remove the wreck of the Huichol. Tr. 271 at 2–6. Furthermore, he was unable to express an opinion as to whether Mexico had implemented its internal law to conform to its rights and obligations under Articles 56–60 of UNCLOS. Tr. 271 at 7–16.

Finally, Professor Oxman suggested that, although the main negotiating session took place in 1974 at the Third United Nations Conference on the Law of the Sea, the concept of the EEZ was generally accepted into international law in 1975–1976. Tr. 273 at 18 to 274 at 18.

### D. *Alberto Szekely*

Alberto Szekely is a career officer of the Mexican Foreign Service who holds the title of Ambassador by designation of Mexico's President. Tr. 276 at 20. He is currently on a leave-of-absence from the Mexican foreign service and testified before the Court in his private capacity as an expert in Mexican Law of the Sea and International Law of the Sea. Tr. 277 at 15; Tr. 299 at 3–6.

Ambassador Szekely, similar to Professor Oxman, possesses extensive academic credentials in international maritime law. Moreover, he was the legal adviser to the Mexican delegation to the Law of the Sea Conference and retained that position from 1973 until 1982. He is familiar with the

relationship between Mexican laws on sea matters and the rules that govern the International Law of Sea Convention. When Mexico modified its Constitution to create the EEZ, Szekely participated in the draft of legislation to accomplish that. Hence, the Federal Marine Law—passed in December of 1985 and effective in January, 1986—incorporates the terms of UNCLOS. Tr. 282 at 10—Tr. 283 at 20. He has also published books on Mexican Law of the Sea. Tr. 285 at 14.

In his testimony, Ambassador Szekely distinguished International Law of the Sea from Mexican maritime law. The former he referred to as "public law" while the latter is a matter of "private law." Tr. 286 at 23 to 287 at 15. According to Szekely, the Mexican government's authority to order wreck removal is not a question of private maritime law, but rather a matter of public law. Tr. 286 at 10. He couches the issue as follows: Did the Mexican government have authority to issue a wreck removal order which is purely a matter of "public law" as determined by the statutes concerned with Mexican Law of the Sea.

Ambassador Szekely admittedly has never participated in any Mexican maritime law cases, has no experience with wreck removal orders, and has never participated in an Amparo proceeding arising from a maritime occurrence. Tr. 288 at 18 to 289–19; Tr. 294 at 8. Nevertheless, he has experience in the application and interpretation of the Law of Navigation and Maritime Commerce. Tr. 293 at 13.

At the outset of his testimony, Ambassador Szekely refused to concede that the Port Captain's order was in fact an order. Tr. 303 at 21. Assuming arguendo that it was an order in fact, Ambassador Szekely did not believe it was valid. Because Mexican law as it pertains to wrecks is location-oriented and assesses a wreck's impact on navigation, the failure of Exhibit 8 to include those basic ingredients makes it invalid and inapplicable to the wreck of the Huichol. Tr. 304 at 2–20.

Ambassador Szekely was asked about the status of UNCLOS under Mexican law and the relation of UNCLOS to the Federal Marine Law. He explained that when Mexico ratified UNCLOS, it became part of the supreme law of the land and is therefore incorporated into Mexican law. Tr. 305 at 17. The Federal Marine Law adopted by the Mexican Congress and published in 1986 brought UNCLOS into Mexican law. Tr. 305 at 23—Tr. 306 at 1–3. The Federal Marine Law deals with all of the waters where Mexico can exercise jurisdiction and it specifies what rights and obligations Mexico may exercise on the basis of UNCLOS in Mexico's marine zones. Tr. 305 at 5. The marine zones to which he had reference are as follows:

1. Internal Waters. He described these waters as those inside the territorial sea and not part of the territorial sea. These include waters subject to federal jurisdiction and local waters located within the states. Tr. 308 at 18.

2. Territorial Sea. This area is commonly referred to as the twelve-mile limit which is the property of Mexico. Tr. 309 at 4.

3. Continuous Zone. An additional twelve-mile zone serves as a buffer zone to protect the territorial sea and extends up to twenty-four miles from the coast. Tr. 309 at 10.

4. Continental Shelf. An area measured from the outer limit of the territorial sea wherein Mexico has sovereign rights for the purposes of exploring, exploiting, conserving and managing the natural resources of the continental shelf. Tr. 309 at 18; Tr. 310 at 3–25.

5. Exclusive Economic Zone. Previously referred to as the EEZ, wherein Mexico has sovereign rights to explore, exploit, conserve and manage the living and non-living resources located in this zone. Tr. 309 at 22.

It is undisputed that the Huichol sank in the seabed of the EEZ. Tr. 311 at 11.

Only certain statutes permit the government to require the owner of a ship to remove its wreck. They are the Law of General Means of Communication and the Law on Maritime Navigation and Commerce. Tr. 311 at 20; Tr. 314 at 7. Article 16 of the Mexican Constitution—the principle of legality—is the due process clause of the Mexican

Constitution. It requires a statement of facts and the recitation of a legal provision before a citizen can be given a government order. Tr. 314 at 11. Under Article 263, for Article 16 to apply, a vessel must sink in a port or in proximity affecting the port. It is a location-oriented provision. If the vessel sinks outside of the port, it must affect the port. Tr. 315 at 12. A port in accord with Mexican law is a location designated as such by statute. The federal executive fixes the limits of the port by decree. Tr. 315 at 25— Tr. 316 at 11. Both Cayos Arcos and Carmen have been declared to be ports under Mexican law. Tr. 316 at 19. Only the port limits of Cayos Arcos have been established by decree. Tr. 316 at 21. Where port limits are designated by a decree, they are deemed to be consistent with the limits of pilotage. Tr. 317 at 16. Exhibit 384 describes the port limits of Cayos Arcos. The Huichol did not sink within the Cayos Arcos port limits. Id.; Tr. 318 at 23. Carmen's pilotage limits are measured by a one nautical mile semicircle drawn from the landing buoy of the port which would give the port a 7.9 nautical mile limit from the coast. Tr. 320 at 3–9. The waters of the port are deemed to be internal waters.

The jurisdiction of the office of port captain is a concept different from the limits of the port. His jurisdiction can extend beyond that of the port. Tr. 321 at 7. What the Port Captain can do in his jurisdiction also is controlled by statute. Tr. 321 at 11. Outside of the limits of the port, he may perform police functions as they pertain to health, sanitation and customs. He also serves as auxiliary to the public prosecutor. Tr. 321 at 18.

The Port Captain's functions, however, are limited within a given geographical jurisdiction. Tr. 323 at 4. He is not empowered to order wreck removal at all locations within his jurisdiction, but only in defined areas according to limited criteria. Tr. 323 at 10.

Article 263 applies to only two geographic locations. First, it applies to the port proper. Second, Article 263 is applicable outside the port, provided the event is proximate to and affects the port. If the wreck sinks within the port, it need not affect the port for the Port Captain to order its removal. Tr. 324 at 8–15. The phrase "affect the port" in his opinion was a legislative directive to protect the interest of navigation to and from the port and within the port. Tr. 325 at 1–13. In support of his interpretation of legislative intent, the Ambassador reviewed Article 33 of the Administrative General Regulations for the Police of Ports promulgated in 1941, which compels owners of a vessel sinking within a port or in places which interrupt navigation to remove them within a reasonable time limit. Tr. 326 at 2. Accordingly, interruption of navigation was the effect on the port that the legislature sought to prevent. Tr. 326 at 23. So, according to Ambassador Szekely, neither Article 263 nor Article 33 support removal of the Huichol because it did not sink in a port or in a place that could interrupt navigation to or from the port. Tr. 327 at 8–17.

Ambassador Szekely also disagreed with the applicability of Article 86 of the Law of Maritime Navigation and Commerce. This law passed in 1963 is also location-oriented in its design. Its wreck removal reach is limited to a port, an area considered to be a port by Article 33 of this law, or a general waterway of communication, in a manner which constitutes either a navigational obstacle or in a manner that affects navigation. Tr. 328 at 17—Tr. 329 at 1–18. Removal from a general waterway of communication is subject to the condition that the wreck is a navigational obstacle or affects it. These provisions, the Ambassador suggests, further buttress his construction of Article 263 by their focus on the port and the legislative interest in navigation within the port free of wrecks. Tr. 329 at 19–24.

The phrase "general waterway of communication" is defined in Article 1 of the Law of General Means of Communication. The first section describes territorial waters, while the remaining sections pertain to federal waters. Tr. 330 at 21. The wreck of the Huichol was not within a general way of communication. Tr. 331 at 17. Article 9, Paragraph III of the Law on Maritime Navigation and Commerce makes reference to the general means of communication by water and the phrase "other waters of federal jurisdiction" refer to

sections II, III and IV of Article I. They are all waters of federal jurisdiction, separate and apart from international or foreign waters. Tr. 332 at 5—Tr. 333 at 6. Article I of the Law of General Means of Communication is still valid and has not been abrogated or derogated by subsequent statutory enactments. Tr. 334 at 7; Tr. 358 at 15; Tr. 359 at 1.[8] He finds support for his position by the Law of Navigation and Maritime Commerce's reference to the Law of General Ways of Communication in three distinct articles. They are: Articles 6, 9 and 86. In his opinion, the outer limit of the general way of communication by water is the territorial sea which is the property of Mexico. Tr. 336 at 21—Tr. 337 at 14. Because the Huichol sank in the EEZ, a marine zone subject to an international treaty and not owned by Mexico, its occurrence location cannot be construed as a general way of communication by water. Removal would not be proper without further enabling legislation.

Ambassador Szekely stressed that international law and respect for international law is a major component of Mexico's foreign policy.[9] Tr. 338 at 9. To assert that the statutes cited by the Port Captain in his order were applicable to the EEZ would constitute a violation of international law. Tr. 341 at 1.[10] Those statutes pertain only to areas that are designated as property of Mexico, the coastal state, and violate international law because the EEZ is not the property of the coastal state. Tr. 341 at 5. Furthermore, he reasoned that just because international law does not explicitly prohibit Mexico to do certain things, it does not mean certain actions taken are necessarily legal. Tr. 345 at 7. This is especially true when a particular governmental order involves and affects a private citizen. To order a private person to do something, the government must respect the principle of legality. There must exist statutory authority as well as facts that make the statute applicable. Tr. 345. Under international law, Mexico could have passed a statute to permit the removal of a Mexican-

owned vessel in the EEZ. Tr. 345 at 18. It did not.

Ambassador Szekely also found the Port Captain's order invalid on a strict interpretation of international law. He explained that the Huichol was a Panamanian flag vessel and that the Articles cited in the Port Captain's order are territorial based and only apply to Mexican flag vessels. Tr. 346 at 2–12. Regardless of ownership, foreign flag vessels require the intervention of the foreign flag government. If they are not consulted, it is a violation of international law. Tr. 347 at 20 to 348 at 1.

When the Law on Maritime Navigation and Commerce was passed in 1963, the Mexican Congress did not intend to include the EEZ within the definition of General Way of Communication by Water. Tr. 351 at 9. The EEZ concept did not exist in 1963. Tr. 354 at 18. Ambassador Szekely explained the delicate negotiations that led up to acceptance of the EEZ as a concept in or about 1971. Tr. 351–55. What finally emerged was an agreement that there would be coexistence of sovereign rights and the rights of the international community over the waters of the EEZ. These waters were to remain free and uncontrolled by the coastal state. Tr. 355 at 18. The black-lined area on Exhibit 206 has no legal existence in Mexico. Tr. 356 at 10. A foreign flag vessel is free to sail in EEZ waters but cannot explore or exploit natural resources within the 200 mile limit. Tr. 357.

With particular reference to the Federal Marine Law of 1986, a law that Ambassador Szekely drafted, general ways of communication by water were not defined. Tr. 360 at 4. Also, the law does not contain any provision that would confer wreck removal jurisdiction on Mexico in the EEZ. Tr. 360 at 10.

Despite the fact that the Port Captain's order did not recite any UNCLOS provisions, Articles 56 and 60 could not have been cited by him as authority for the Mexican government to order Protexa's removal of

---

8. Ignacio Melo disagrees. Tr. 117 at 10–22; Tr. 178 at 1–11.

9. Mexico maintains no army and a small navy. Instead, Mexico regards international law as

"the greatest weapon" in its arsenal. Tr. 338 at 14–17.

10. Professor Oxman disagrees.

the Huichol. Tr. 363 at 23 to 364 at 3. Article 60 is irrelevant because the Huichol was not a structure and the wreck of the Huichol was not within the five hundred meter zone of navigational jurisdiction surrounding a structure. Tr. 364 at 21 to 365 at 1. The black-lined area on Exhibit 206 is not a high security or safety area because it was not legally established by a decree and published in the Official Gazette. Tr. 365 at 24; Tr. 367 at 9. Moreover, an attempt to establish a safety area and to limit foreign navigation in the EEZ would violate international law. Tr. 368 at 6–12. In fact, Mexico has not taken legislative advantage of the right granted to it by Article 60 of UNCLOS to establish a 500 meter safety zone around each of its installations. *Id.* at 18.

As to whether Article 56 of UNCLOS applies, Ambassador Szekely acknowledged that Mexico had a right to pass a statute that would permit wreck removal in the EEZ. Tr. 369 at 22. Any such statute would have to be consistent with the five hundred meter zone of navigation because of the insistence of the international community to keep the high seas free and passable. Tr. 370 at 16. No such statute has been passed. Neither have any statutes or decrees been passed pertaining to the protection and preservation of the EEZ's marine environment. Tr. 371 at 1.

In the final phases of his direct testimony, Ambassador Szekely attacked the validity of the Port Captain's order. He refused to concede that it is an order, because it does not contain a direction to remove a sunken vessel. Tr. 372 at 20. The facts stated are insufficient, in his opinion, to apply the cited statutes. Tr. 376 at 1 to 377 at 12. More particularly, the order does not indicate that the wreck is in the port or affects the port. Tr. 378 at 10. Additionally, it orders wreck removal at a location beyond the Port Captain's subject matter jurisdiction. Tr. 379 at 1. Article 16 considerations aside, Exhibit 8 is not an order but a communication absent any mandatory language. Tr. 386 at 19. It is a request for Protexa to post a deposit to either clean the area or to reimburse the Mexican government for its cost of removal if the sinking of the Huichol was Protexa's fault.[11] Tr. 387. Ambassador Szekely attributed the non-mandatory language of the order to the Port Captain's uncertainty as to his jurisdiction over a wreck in the EEZ, his lack of knowledge as to the cause of the sinking, the incomplete state of his investigation, and his inability to determine whether it was necessary to raise the Huichol. Tr. 400–402.

Lastly, he was of the opinion that although the Mexican government has the right to order an investigation, it did not have the authority to require Protexa to expend its own funds to raise a wreck or to assist in the government's investigation. Tr. 403 at 7. Without a legal basis, the government must pay for the investigation. Tr. 404 at 1. Ambassador Szekely concluded that he knew of no law or statute that requires a private person to pay for the expense of a government investigation. Tr. 404 at 6.

On cross-examination, Szekely reiterated his position that the Mexican government has failed to enact legislation to permit the Port Captain to order wreck removal in the EEZ. Articles 86, 262 and 263 do not apply. He distinguished the difference between an order to a private individual to remove the wreck, the Mexican government's right to remove the wreck and the owner's voluntary choice to remove the wreck to avoid incurring potential liability for damage. Tr. 414 at 9. If the Mexican government has failed to enact an appropriate wreck removal law, then it may have to assume the wreck removal cost. Tr. 414 at 25.

The remainder of his cross-examination constituted a reaffirmation of his direct testimony concerning the status of the order, its invalidity, the territorial limitations of the cited statues, the order's patent violation of domestic and international law, and Mexico's inability without an enabling statute to order a private person to remove a wreck. Tr. 446 to 464.

11. The Port Captain explained that the request to post a bond was to provide funds to hire another salvor in the event Protexa did not remove the Huichol within the time limit of twenty-five days. T. 47 at 11.

He further clarified certain matters which were the subject matter of his direct testimony. First, the word "cercaria" as used in Article 263 means "nearby" and the English word "vicinity" is a more appropriate interpretation than use of the word "proximity." Tr. 492. "Vicinity" is a restrictive term and is best understood when read in relation to the requirement that a sinking affects the port. Tr. 493 at 20. Second, use of the phrase "other waters of federal jurisdiction" as used in Article 9, Paragraph III, is to distinguish the federal waters from state or local waters. Tr. 500 at 23 to 501 at 1. Moreover, the waters of the EEZ are not waters of federal jurisdiction. They are the high seas and fall within the purview of Article 58 of UNCLOS. Third, Articles 263, 262 and 86 pertain only to Mexican flag ships. Tr. 507 at 21. Only a flag state may exercise jurisdiction over a vessel. Tr. 508 at 19.

Lastly, the limits of jurisdiction of the Port Captain of Carmen were decreed in 1985. Tr. 489 at 5; Tr. 490 at 1; Tr. 514 at 14; *see also* Exhibit 206. They are not waters of federal jurisdiction and should not be confused with the jurisdiction of the port which is a more limited jurisdiction. Tr. 507 at 3.

### E. *Francisco Alva Rosas*

Francisco Alva Rosas is the Chief Pilot of Lazaro Cardenas and has served as an Acting Port Captain in the absence of the Port Captain. Tr. 525. It was his opinion that the anchorage prohibited zone, as represented by the black-lined area on Exhibit 206, is located in international waters and the Port Captain's permission is not required to anchor. Tr. 557 at 19. He agreed with Ambassador Szekely that the Port Captain cannot order a wreck removal beyond the twelve-mile limit. Because the Huichol was beyond territorial waters, the Port Captain could not order the wreck raised. Tr. 564. He further agreed that the Huichol was not in the proximity of the port. Moreover, it was not a hazard to navigation and it was unnecessary to raise the wreck to do an investigation. Divers could have been used preliminarily. Tr. 567.

### F. *David Pockett*

David Pockett testified in the first trial as an expert in wreck removal and salvage. He acknowledged that oil companies such as PEMEX maintain charts where oil pipelines lay. Tr. 584 at 21. The Huichol anchored in an area as directed. Pockett inferred that PEMEX certainly knew that the area was clear of oil pipelines. Tr. 588 at 24.

He placed the wreck 1.3 nautical miles inside the eastern boundary of the anchorage prohibited area.[12] In his opinion, the nearest oil pipeline was 2.5 nautical miles from the wreck of the Huichol, and there was no evidence of future oil exploration in the area where it sank. Tr. 707 at 40; Tr. 711 at 18. The development trend of oil platforms is to the west and away from the Huichol wreck. Tr. 747. The closest new oil platform is three nautical miles from the wreck of the Huichol. Tr. 752 at 3.

### III. *DISCUSSION*

Despite Ambassador Szekely's protestations that the Port Captain's order is not an order because of the major deficiencies he highlighted in his testimony, the Court holds otherwise. Admittedly, the language of the order is imprecise and more polite than mandatory. Yet, now having had the opportunity to listen to the testimony of Captain Rebolledo and Ignacio Melo, the Court will accord Exhibit 8 order status. Notwithstanding the fact that Ambassador Szekely's criticisms of the writing were well taken and of concern to the Court, Captain Rebolledo's intent to issue an order weighs heavily in the balance. Additionally, it is unnecessary for a Port Captain to be a wordsmith in the preparation of a wreck removal order. Here, he recited that the sinking of a ship had occurred, experts had been appointed to determine the course of the sinking, the occurrence fell within the purview of certain statutory articles, the vessel must be salvaged, and that a bond must be posted within twenty-five days to guarantee any damage or loss that may arise from the salvage operation.

12. A nautical mile is 6088 feet. There are 1853 meters to a nautical mile.

Both Captain Rebolledo and Ignacio Melo directed the Court's attention to the document as a whole and discount its lack of specificity as described by Ambassador Szekely. This focus comports with the atmosphere of psychological turmoil that immediately surrounded this tragic event. The Port of Carmen exists and operates in support of offshore oil exploration and exploitation. Captain Rebolledo was concerned about the safety of this area, the cause of the Huichol's sinking, the Marine Mercante's oversight and the national interest in recovery of the remains of lost crew members. Moreover, his jurisdiction for certain specified purposes extended up to a two hundred mile limit; this area encompassed the wreck of the Huichol.

When this Court issued its prior Opinion, *Grupo*, 753 F.Supp. 1217, it commented that "no phrase in the body of the [Port Captain's] Order direct[ed] wreck removal." *Id.* 1232–33. While this statement is literally true, it now proves to be inaccurate in light of Captain Rebolledo's expressed intent and a review of the order in its full text.

The determination that Exhibit 8 is in fact an order does not end the Court's inquiry. Protexa may only recover under the policy provision in question if the Port Captain's order was a *valid* removal order. *Grupo I*, 954 F.2d at 138. As the Court of Appeals stated: "Under the correct interpretation of the phrase 'compulsory by law,' the meaning and validity of the Port Captain's order are critical factors." Lurking in the background is Protexa's contention that the act-of-state doctrine precludes the validity inquiry mandated by the appellate court. Under this doctrine, Protexa asserts that an American court is precluded from judging the validity of the order. *Id.* at 139. Although this issue was raised on appeal, the Court of Appeals declined to consider it because this Court had not addressed whether the Port Captain's order was in fact an order, no less a valid order. Because the Court has now decided that the Port Captain's writing was an order and that it directed removal of the Huichol wreck, the Court will turn to consideration of the act-of-state doctrine and its alleged preclusive effect.

## A. *Act–of–State Doctrine*

While arguably the act-of-state doctrine could be applied here, caution and fundamental fairness counsel against the use of this judicially fashioned remedy. In *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1293 (3d Cir.1979), this Circuit commented that "preclusion is not lightly to be imposed." *Id.* at 1293. Moreover, the policies that underlie the act-of-state doctrine are not implicated here. These policies include adherence to principles of international comity, respect for sovereign nations on their own territory and deference to the executive branch in the administration of foreign policy. *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp.*, 493 U.S. 400, 419, 110 S.Ct. 701, 704, 107 L.Ed.2d 816 (1990). With all due respect to Protexa and the Mexican government, this is an insurance coverage dispute between private parties and of no interest to the respective governments of Mexico, the United States or the international community. No Mexican national policy is at stake. Rather, what hangs in the balance is the decision of the Port Captain on a purely local matter that will eventually determine who will pay the bill for the wreck removal. The propriety of the Port Captain's behavior is ancillary to the real issue before the Court.

Nothing about this dispute, ongoing since 1985, has attracted the attention of the respective governments of Mexico, the United States or the international community at large. Panama, the vessel's flag registry of convenience, has remained silent. Furthermore, this Court is not creating principles of domestic and international law, but is applying them as they have been promulgated by their respective entities.

Of considerable impact to the Court's decision to forego application of the act-of-state doctrine is Protexa's use of it as a sword rather than a shield. The case law reviewed by the Court teaches that a court is less likely to invoke the act-of-state doctrine when it is interposed by the party seeking relief (citations omitted). The apparent reason for this is fair play and fundamental justice. This is especially true in this case. Protexa chose to bring this action in the

district of New Jersey and thereby deprived a Mexican court from adjudicating the validity of the Port Captain's order. Moreover, Protexa resisted AAMS *forum non conveniens* dismissal application. It would be unjust to permit Protexa the benefit of an American forum and the protection of a doctrine that would unfairly impede the defendants in their ability to assert a defense.

The Court need not reach AAMS' other territorial-based objections raised in opposition to Protexa's advance of the act-of-state doctrine. *Grupo I*, 954 F.2d at 139. Because this is a dispute between private parties, and generally not amenable to resolution by use of the act-of-state doctrine, the Court will now determine the validity of the Port Captain's order on the merits.

## B. *Statutes of the Republic of Mexico*

### 1. *Article 86*

■ The Port Captain's order cited Articles 86 of the Law of Navigation and Maritime Commerce and Articles 262 and 263 of the Law of General Means of Communication. Beyond a literal reading of the Articles, Ignacio Melo and Ambassador Szekely testified as to their interpretation. Each of these witnesses are recognized an distinguished in areas of maritime law. Each agreed that the Huichol sank outside of territorial waters and in the EEZ. They disagreed as to the Port Captain's authority to order wreck removal at that location at the expense of a private citizen.

Mr. Melo submitted that Article 86 is not limited by its territorial water reference, but permits wreck removal at the wreck's location. He reasoned that the waters of the EEZ are considered to be general means of communication by water. To arrive at that position he looked to Article 9, Paragraph III, and the phrase "other waters of federal jurisdiction." He asserted that other waters of federal jurisdiction is part of the general means of communication by water. Because Mexico has sovereign rights in the waters of the EEZ, he concluded that the waters of the EEZ are a general means of communication by water. Furthermore, other waters of jurisdiction represent a statutory anticipation that Mexico would obtain jurisdiction over waters they do not own but in waters in which they possess sovereign rights.

Ambassador Szekely offered a totally different analysis. He stressed location of the wreck and the wreck's impact on navigation as the interpretive ingredients necessary to an understanding and application of Mexican wreck removal law. Article 86 is a statute that permits wreck removal under limited circumstances. It is location-oriented in its design. Three designations are located: a port, an area considered to be a port by Article 33 or in a general waterway of communication. Additionally, the sinking of the ship must constitute a navigational obstacle or affect navigation.

While Melo reasoned that the waters of the EEZ were waters of general means of communication, Szekely rejected that notion. First, he pointed to Article I of the Law of General Means of Communication wherein the phrase "general waterway of communication" is defined. Except for Roman Numeral I of that Article, which refers to territorial waters, all its other sections pertain to federal waters.

Melo contended that Article I was abrogated by Article 9 of the Law of Navigation and Maritime Commerce, a legislative pronouncement passed twenty-three years later. Through reference to Article 6, Szekely interrelated Article 9, Paragraph III, to the earlier enactment of Article I. Szekely explained that, except for the territorial waters of Article I, all other delineated waters were waters of federal jurisdiction. Because Article 9, Paragraph III included other waters of federal jurisdiction as a subcategory of the general means of communication by water, Article I of the Law of General Means of Communication is still valid and has not been abrogated or derogated by subsequent statutory enactments. Accordingly, in Szekely's opinion, the outer limit of the general way of communication by water is the twelve-mile limit of the territorial sea which is the property of Mexico. Because the Huichol sank in the EEZ, a marine zone beyond the territorial sea, it did not sink in a general way of communication by water.

Ambassador Szekely also debunked Mr. Melo's theory that other waters of federal jurisdiction were a statutory anticipation of Mexico's creation of the EEZ. In that regard, Szekely traced the history of the EEZ and the delicate negotiations that led up to its creation. In 1963, when the Law on Maritime Navigation and Commerce was passed, the concept of the EEZ was unformed and did not develop its physical contours until 1971. Mexico established its two-hundred mile zone in February, 1976, and ratified UNCLOS in 1982. Hence, the Mexican Congress did not intend in 1963 to include the EEZ within the definition of general way of communication by water as set forth in Article 9, Paragraph III.

Ambassador Szekely's knowledge of the statute's language and his grasp of the legislative history is compelling. The Court adopts his rationale and concludes that Article 86 is territorially based, limited to the property of Mexico, bounded by a twelve-mile border and limited to a port or in an area considered as such. Furthermore, its application is restricted to an obstacle to navigation or one which affects it. Because none of these requirements pertain to the wreck of the Huichol, Article 86 was unavailable to the Port Captain as a legal basis for the wreck removal order. Captain Rosas's testimony was consistent with that of Ambassador Szekely.

### 2. *Article 263*

Mr. Melo relied on the language "provided it affects the port" as the legal basis for this Article's relevance. Although Article 86 requires a hazard to navigation to be applicable, Article 263 does not. He interpreted "affects the port" in an economic sense and interconnects the oil field activity with the commerce attached to the Ports of Carmen and Cayos Arcos. Captain Rebolledo expressed a similar view.

Ambassador Szekely's testimony on this Article was in disaccord with the conclusions drawn by Melo and Rebolledo. He countered that Article 263 applies to only two geographical locations. First, it applies within the port. Second, its effect outside the port is limited by proximity to the port and

affect upon the port. In earlier testimony, Ambassador Szekely explained the difference between the jurisdiction of the office of Port Captain and the limits of the port. The port limits of Carmen are deemed to be consistent with the limits of pilotage. The waters of the port are internal waters. All parties agree that the Huichol did not sink within the Cayos Arcos port limits.

According to Ambassador Szekely, if a vessel sinks within the port, it need not affect the port for the Port Captain to order its removal. If the vessel sinks outside the port, however, it must be in the proximity of the port and affect the port. The parties quarreled as to whether the English translation of the Spanish word "cercaria" as used in Article 263 means "vicinity" or "proximity." Ambassador Szekely indicated that the literal translation of the word means "nearby" and the English word "vicinity" is a more appropriate interpretation. He reasoned that vicinity is a more restrictive term than proximity and is best understood when read in relation to the requirement that the sinking affects the port.

The phrase "affect the port" in Szekely's opinion was a legislative directive to protect the interest of navigation within the port and to and from the port. In support of this premise, he focused on Article 33 of the Administrative General Regulations for the Police of Ports promulgated in 1941. That regulation compels the owner of a vessel sinking within a port or in places which interrupt navigation to remove it within a reasonable time limit. Accordingly, he reasoned, the legislative concern focused on interruption of navigation. Because the Huichol did not sink in a port or a place in the vicinity of the port and the location of the Huichol wreck could not interrupt navigation to and from the port, Article 263 was unavailable as a predicate for the Port Captain's order.

The Court agrees with Ambassador Szekely. The 7.9 nautical mile limit of the port places the Huichol wreck beyond the subject matter jurisdiction of the port. Moreover, use of the term "vicinity" rather than the word "proximity" is more reasonable in light of the legislative interest in the free flow of

navigation to the port. The essence of the cited wreck removal statutes fixates on the port or its vicinity. Surely Mr. Melo's sense of economic well-being for the port, supported by Captain Rebolledo, is a sage observation, but not one that is capable of extending Article 263's grasp to an area 45 miles distant from the coast. Because no navigation was interrupted within the port or its vicinity, the Court finds that the Huichol wreck did not affect the port and that Article 263 was improperly invoked.

### 3. Article 262

This Article of the Law of General Means of Communication authorizes an investigation that arises from an occurrence outside a port which affects the crew. The plain language of the Article, particularly on line 5 of the English translation, apparently refers to the Captain of the vessel as opposed to the Captain of the port. Use of the phrase "navigation diary or binnacle substituting it" are words more closely associated with the Captain of a vessel than the Captain of the port. Additionally, the obligation to inform the maritime authorities upon arrival to port lends credence to the notion that the initial out-of-port investigation is to be performed by the Captain of the vessel. The Port Captain may, however, if deemed appropriate, appoint two experts who will give an opinion on the cause of the accident any parties presumed responsible. It then becomes the further responsibility of the Port Captain upon termination of the investigation, to turn over the results of the investigation to the Federal District Attorney within five days.

The issue before the Court as it pertains to this Article is not whether the Port Captain may initiate an investigation or whether it may order the wreck removed for a visual inspection. The pivotal question is whether the Mexican government has the authority to require a private citizen to expend its own funds to raise a wreck to assist a government investigation. Both Captain Rebolledo and Mr. Melo answered this question in the affirmative. Ambassador Szekely, to the con-

trary, finds no legal basis that would require a private person to pay for the expense of a government investigation unless the private citizen were at fault.

The Court is obligated to decide this issue as a matter of law and will not consider whether the Port Captain's decision was prudent or whether his investigation could have been performed more economically by divers or remote operated vehicles (ROV's).[13] Nor will the Court's decision second-guess whether the wreck could have remained at its original location or why PEMEX was a disinterested observer to a catastrophe that occurred at or near their oil equipment. To inquire as to those matters are precisely the types of inquiry that intrude on a sister nation's sovereignty and provoke an unnecessary diplomatic incident. Goodwill and comity preclude this inquiry similar to application of the act-of-state doctrine.

It is important to note that Article 262 is not a wreck removal statute. Furthermore, unlike Articles 86 and 263, Article 262's scope is not port-centered in its reference. Conceivably, it could extend to a vessel located in the EEZ because the Port Captain may perform police functions within his jurisdiction as they pertain to health, sanitation and customs. He also serves as auxiliary to the public prosecutor. As previously noted, his jurisdiction as decreed in 1985 and delineated by the blue-lined area on Exhibit 206 is limited both geographically and functionally.

Given that Article 262 permits the Port Captain to commence an investigation and appoint investigators, it does not necessarily follow that he can burden the shoulders of a private citizen. As Ambassador Szekely noted, the Federal Marine Law of 1986 is silent as to wreck removal and does not authorize wreck removal jurisdiction in the EEZ. Without such a legal basis, Szekely concludes that the government must pay for the wreck removal incident to its investigation. Through conscious choice not to enact wreck removal provisions, the Mexican government effectively has assumed that cost for itself when it orders wreck removal as an adjunct to its own initiated investigation.

---

13. Captain Rosas testified that it was unnecessary to raise the wreck to perform an investiga-

tion. He suggested that the use of divers would have been a more reasonable alternative.

In speaking of Article 262, Mr. Melo characterized the right to investigate and the right to issue an order of wreck removal as concepts of public order to be handled by the government. Although the statement is true and unassailably correct, it begs the question as to who pays for this concept of public order. Should it be the government's obligation or should an innocent citizen be responsible for this expense?

Ambassador Szekely relied on the Mexican Constitution and the principle of legality. Because of the due process connotation of that principle as entrusted to the Mexican people by Article 16 of the Constitution, he disavows the propriety of the wreck removal order to Protexa. More specifically, he noted, "The government must respect the principle of legality." Without a statutory imperative, the Port Captain lacks authority to order a private citizen to remove a wreck at the private citizen's own expense.

If the theme "we are a government of laws and not of men" has meaning, then the principle of legality must be accorded the same respect we demonstrate toward our own "due process clause." Article 262 permits a government investigation, the appointment of investigators and a wreck removal to determine the cause of its sinking, but at government expense. Both Mr. Melo and Ambassador Szekely agreed that under the Mexican Constitution a statute must exist before the government can order an individual to engage in a given act. Both the relevant facts and the law to be invoked are constitutional precepts that must be present to warrant application of a law. Here, there is no law to apply and the facts are marginally stated. The Port Captain's order that directed Protexa to remove the wreck at Protexa's expense under this provision was likewise invalid.[14]

### 4. United Nations Convention on the Law of Sea

Two initial observations are germane to this Court's analysis of UNCLOS. First, UNCLOS was not incorporated into Mexican law until 1986 when the Federal Marine Law was published. The sinking of the Huichol and the Port Captain's order predated this law's effective date. Second, the Port Captain did not cite to UNCLOS as authority to remove the wreck. Based on Article 16 of the Mexican Constitution, both Melo and Szekely agree that a statute must exist before the government can order an individual to engage in a given act. Melo concluded that, because the Port Captain's order did not cite to UNCLOS, he obviously did not rely on UNCLOS for the order's validity. These observations aside, the Court will discuss the relevant portions of this convention.

Professor Oxman and Ambassador Szekely have each developed international reputations with regard to international law on UNCLOS. Each acknowledge the other's international credentials. The Court was visibly impressed with their testimony. Yet, even the best of experts disagree.

Professor Oxman rendered an opinion that the Port Captain's order was not a violation of international law and was in fact consistent with Mexico's rights and duties under international law. Unlike Ambassador Szekely's focus on statutory authority, Oxman would examine Mexico's behavior as a coastal state in international waters. On page 21, *infra*, he provided a catalog of reasons that demonstrated to him that the Port Captain's order was consistent with international law. Indeed, it was his opinion that private parties must obey the government's order, even if the government exceeds its authority.

Professor Oxman further believed that, when presented with two potential, statutory instructions, local statutes are to be construed consistent with the coastal state's international obligations. Professor Oxman was unwilling to agree, however, that the statutes set forth in the Port Captain's order must be interpreted under international law as permitting wreck removal in the area of the EEZ. He pointedly stated that should these statutes be interpreted as inapplicable beyond the twelve-mile limit and render this

---

14. The wreck was raised, visually inspected and resunk in shallower waters. No cause for the wreck has ever been determined, despite the Port Captain's protestations that removal was necessary to determine cause. If the cause has been determined, it has not been publicly reported.

area essentially lawless, the Mexican legislature would have to enact a new statute to meet its international obligations. Nevertheless, he felt that application of Mexico's territorial sea law to the EEZ would not violate international law unless it interfered with another state's rights.

On cross-examination, Professor Oxman was unable to render an opinion as to whether the Mexican statutes in question would impose obligations on private citizens. Finally, he was unable to determine whether Mexico had implemented its internal law to conform to its rights and obligations under Articles 56–60 of UNCLOS.

Ambassador Szekely stressed that international law and respect for international law is a major component of Mexico's foreign policy. To apply territorial statutes to the EEZ, would violate international law. This position is contrary to Professor Oxman's. Szekely provided two reasons. First, territorial statutes pertain to the property of Mexico, the coastal state. The EEZ is not the property of the coastal state but only an area over which they have sovereign rights. Second, simply because international law does not explicitly prohibit Mexico to perform certain acts, it does not mean certain actions taken are necessarily legal. He provided two examples of this principle. One involved an order to a private citizen without statutory authority. His other example, based on a strict interpretation of international law, restricted the application of territorial-based statutes to a Panamanian flag vessel. Moreover, the failure to consult the flag nation and to offer intervention, despite Mexican ownership, is a pure violation of international law.

More specifically, Articles 56 and 60 could not have been cited by the Port Captain, even if he had been aware of their existence. Article 60 is irrelevant because the Huichol as a wreck was not a structure and the wreck did not lay within the five-hundred meter zone of navigational jurisdiction surrounding a structure. Professor Oxman agreed. As Ambassador Szekely noted in the newly enacted Federal Marine Law Mexico not only chose to ignore a wreck removal provision in the EEZ, but also failed to take advantage of the zone of navigational jurisdiction to which the Court just adverted.

The Ambassador's testimony with regard to Article 56 restates prior testimony, except to emphasize that the EEZ is located in high seas and must be maintained free and passable. Therefore, any statute passed would have to be consistent with the UNCLOS provisions and particularly Article 58. Hence, the anchorage prohibited zone and high safety area which so concerned Captain Rebolledo has never been established by a decree and published in the Official Gazette. It has no legal existence and as currently constituted would violate international law if it limited foreign navigation in the area of the EEZ. Captain Rosas observed that the anchorage prohibited zone is located in international waters and the Port Captain's permission to traverse or anchor in these waters is not required.

While the Court was impressed with Professor Oxman's overview of international law and UNCLOS, it was more impressed with his candid observations that if a territorial-based statute is inapplicable beyond the twelve-mile limit, the Mexican legislature will have to enact a new statute to meet its international obligations. This comports with Ambassador Szekely's testimony. Szekely ruled out the territorial statutes on wreck removal and deplored the absence of a wreck removal provision in the 1986 Federal Marine Law.

Professor Oxman honorably refused to step beyond the purview of his qualifications. No opinion was rendered by him on whether Mexico had implemented its internal law to conform to its international obligations nor was he able to render an opinion as to whether the Mexican statutes in question could impose obligations on private citizens. Through Szekely's foreign service career for the Mexican government, Szekely was able to supply this information. His knowledge of the Federal Marine Law and the constitutional principle of legality answered these inquiries.

According to Szekely, the specter of international law violations haunts the Port Captain's order. The designation of the anchor-

age prohibited zone, the lack of statutory authority to order wreck removal in the EEZ, and the failure to consult Panama are occurrences that trespass the spirit of UNC-LOS. Juxtaposed against Szekely's view is Oxman's that the Port Captain's order was not a violation of international law, but was consistent with a coastal state's obligations under international law. However, none of these recited obligations was relevant in regard to the Huichol. The Huichol was a maintenance vessel that supported PEMEX operations. The wreck rested 1.3 nautical miles outside the eastern boundary of the anchorage prohibited area. The nearest oil pipeline was 2.5 nautical miles from the wreck of the Huichol.[15] Finally, the development trend of oil platform structures was in a westward direction, away from the Huichol wreck. Because of the depth of the water, Captain Rosas testified that the wreck was not a hazard to navigation in international waters. According to Pockett and Szekely, the Gulf of Mexico is littered with sunken vessels that have never been raised from their initial place of rest. Furthermore, the Huichol was resunk at a much shallower location.

Although Professor Oxman believed as a precept of international law that private parties must obey the government's orders even if the government exceeds its authority, that expression alone does not determine the ultimate financial responsibility for the act which arises from the use of excessive authority. Here, Mexico lacked authority to force a private citizen to perform an act at the citizen's expense—the raising of the Huichol. And, although this case only concerns insurance coverage, the principle of legality must be observed and not brushed aside. Thus, even if the order had cited to UNCLOS and if Mexico had brought UNCLOS into Mexican law prior to issuance of the wreck removal order, this Court would still find UNCLOS inapplicable for all the reasons testified to by Ambassador Szekely.

### CONCLUSION

Because the Port Captain's order was not valid as to Protexa, the wreck removal engaged in by Protexa was not compulsory by law. Judgment will be entered in favor of the defendants.

An appropriate order of judgment is attached.

---

**15.** Query: What submerged oil pipeline consti-
tuted an environmental hazard to Rebolledo?